RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0421p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MARTIN NOLAN, et al.,
             *Plaintiffs-Appellants,*

    *v.*

MEMPHIS CITY SCHOOLS, et al.,
             *Defendants-Appellees.*

No. 07-6037

───────────────

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 04-03047—Bernice B. Donald, District Judge.

Submitted: June 18, 2009

Decided and Filed: December 11, 2009

Before: McKEAGUE and WHITE, Circuit Judges; MARBLEY, District Judge.[*]

───────────────

**COUNSEL**

**ON BRIEF:** Michael R. Marshall, EVANS & PETREE, PC, Memphis, Tennessee, Cheryl Rumage Estes, THOMASON, HENDRIX, HARVEY, JOHNSON & MITCHELL, PLLC, Memphis, Tennessee, for Appellees.

───────────────

**OPINION**

───────────────

MARBLEY, District Judge. Plaintiffs-appellants Martin Nolan ("Martin") and his father, Nathaniel Nolan ("Mr. Nolan") (collectively "Nolans") brought a civil rights action against Martin's high school basketball coaches, superintendent, principal, and the Memphis City Schools alleging that defendants violated Martin's substantive due

───────────────

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

process rights and Tennessee state law by using excessive corporal punishment against him while he played for the Hamilton High School basketball team. After trial, the jury found for the defendants on all counts. The Nolans filed a timely motion for new trial, which the district court denied. The Nolans now appeal that ruling *pro se*. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

Between 2001 and 2004, Martin Nolan played basketball at Hamilton High School ("Hamilton"). (Record on Appeal ("ROA") Tr. 233.) Defendants Theodore Anderson ("Anderson") and Eldridge Henry ("Henry") coached the various basketball teams at the school. (ROA Tr. 168.)

Hamilton had a corporal punishment policy under which its teachers paddled students. (ROA Tr. 145-46.) Anderson and Henry both paddled students on the basketball team, including Martin. (ROA Tr. 168, 170.) The use of corporal punishment in schools is permitted by Tennessee law. Under the Tennessee code, "[a]ny teacher or school principal may use corporal punishment in a reasonable manner against any pupil for good cause in order to maintain discipline and order within the public schools." Tenn. Code Ann. §49-6-4103 (2008). Each board of education is responsible for adopting "such rules and regulations as it deems necessary to implement and control any form of corporal punishment in the schools in its district." Tenn. Code Ann. §49-6-6104.

Martin testified at trial that Anderson routinely paddled him for missing practice, being late for practice, missing shots, and getting poor grades; and that Anderson paddled him once for missing a car wash. (ROA Tr. 47-48.) He claimed that in a single practice during his ninth grade year he was paddled 12 strokes for missing the car wash. (ROA Tr. 52.) During one away game, Martin contended, Anderson punched him in the chest with a closed fist. (ROA Tr. 57.) During his time at Hamilton, Henry also paddled Martin. (ROA Tr. 59-60.) Martin estimated that he was paddled roughly two to three times a week. (ROA Tr. 49, 60.) The paddlings were painful. On one occasion he

placed his hands between himself and the paddle to block the blows and had to ice his hands due to the injury. (ROA Tr. 53.)   Nevertheless, he admitted that he never complained to Anderson, Hicks, the school principal, or anybody else about being paddled. (ROA Tr. 50, 82.) He also testified that he never sought medical treatment for physical injuries resulting from the paddlings. (ROA Tr. 67.) Furthermore, at trial the Nolans stipulated that Martin was not seriously injured by any of Anderson's or Henry's acts. (ROA Tr. 555.)

At trial, both Anderson and Henry contradicted Martin's account of the frequency and nature of the paddlings.  Anderson testified that he did not specifically remember ever paddling Martin. (ROA Tr. 253.) He admitted that he may have paddled Martin, but estimated that he did so no more than three times during the entirety of Martin's three years at Hamilton. (ROA 253.)  He testified that he did not recall paddling Martin for missing a car wash. (ROA Tr. 235.)  He denied that he ever hit Martin with a closed fist or that he paddled Martin 12 times in one practice for missing lay-ups. (ROA Tr. 233-354, 240-41, 255.)

Anderson explained that players were paddled primarily for misbehavior. (ROA 283-84.)  He also occasionally paddled basketball players for bad grades to let them know that "academics were number one in our program." (ROA Tr. 250.) He noted that he "paddled Martin very rarely because Martin was a good kid . . . he didn't get into trouble and he made good grades." (ROA Tr. 251.)

Henry estimated that he paddled Martin a total of approximately 10 times in the three years Martin was part of the Hamilton program. (ROA Tr. 194.) He testified that he paddled Martin "on a few occasions" for misbehavior during a practice. (ROA Tr. 168-69.) He paddled Martin once or twice based on teacher referrals, i.e., when another teacher asked him to paddle Martin for something that took place in that teacher's class. (ROA Tr. 172-73.) He denied paddling Martin for missing shots but admitted that he may have paddled Martin for "not using the correct technique that had been shown to him [on] several occasions" and that he had paddled Martin once or twice because of grades or poor conduct on his report cards. (ROA Tr. at 169, 173.)

Both Henry and Anderson testified that they never administered more than three strokes during a paddling. (ROA Tr. 178, 255-56.) According to Anderson "three licks is a maximum." (ROA 256.) Henry testified that the paddlings, including Martin's paddling, were not hard. (ROA 181.) He explained that he did not swing hard and instead merely "flick[ed] his wrist." (ROA Tr. 181-82.) Henry and Anderson testified that Mr. Nolan attended practice several times a week and never complained about his son being paddled. (ROA Tr. 187, 193, 263-64, 273.) Mr. Nolan admitted that he was aware his son was being paddled and even saw his son being paddled. (ROA Tr. 301, 322-23.)

Martin also claimed that Anderson was verbally abusive. In December 2003 during an away game in Los Angeles, Anderson allegedly called Martin a "bitch" after he missed a shot. (ROA Tr. 63.) Anderson testified that he told Martin he was "playing like a bitch." (ROA Tr. 242.) Anderson apologized to Martin and his parents for the comment. (ROA Tr. 244-46, 66.)

Martin told his parents about the Los Angeles incident. Mr. Nolan met with Hicks, the school principal, to discuss Anderson's use of verbal harassment when coaching. (ROA Tr. 305.) Hicks promised to address the issue with Anderson. (ROA Tr. 352, 373.) Following the meeting, Mr. Nolan sent a follow-up letter to Hicks. (ROA Tr. 351.) Mr. Nolan's letter does not reference corporal punishment. Instead, the letter thanked Hicks for listening to his concerns and states "[i]t appears that the verbal harassment that my son, Martin Nolan, and other members of the team have endured from Coach Anderson is much more serious than I originally thought." (ROA Tr. 351-52.) Mr. Nolan admitted that he did not voice any concerns about paddling with Hicks. (ROA Tr. 352.) Hicks agreed that Mr. Nolan never talked to him about Anderson paddling or punching Martin. (ROA Tr. 374-75.) Mr. Nolan testified that after he reported Anderson's use of bad language to Hicks, Anderson never again used foul language to Martin or administered corporal punishment to Martin. (ROA Tr. 356.)

When he returned home from the Los Angeles game, Martin decided he no longer wanted to play at Hamilton and stopped attending practices. (ROA Tr. 100-102.)

Around that time, Martin began receiving anonymous harassing phone calls referring to him as "bitch boy" and similar epithets. (ROA Tr. 71-72.) As a result, he sought and received a safety transfer from Hamilton to Central High School. (ROA Tr. 70.)

After Martin transferred to Central he started seeing a psychologist named Dr. Janet Scott. Dr. Scott testified that she began seeing Martin in February 2004. (ROA Tr. 216.) She testified that Martin's counseling centered on two major issues: "the treatment he was receiving as a basketball player" at Hamilton and his desire to have a better relationship with his father. (ROA Tr. 215-16.) Dr. Scott concluded that Martin was suffering from mild depression, low self-esteem, and low confidence. (ROA Tr. 217.) According to Dr. Scott, those symptoms are common in teenagers. (ROA Tr. 223.) She subsequently diagnosed him with an "adjustment disorder with depressed mood." (ROA Tr. 217.) By definition, that diagnosis refers to a transient condition that lasts no longer than six months from its initial onset. (ROA Tr. 221.)

On December 27, 2004, the Nolans sued the Memphis City Schools, coaches Anderson and Henry, Principal Hicks, and Superintendent Johnson. The Nolans claimed that the defendants engaged in a conspiracy that subjected Martin to excessive paddling, assaults, and verbal abuse in violation of 42 U.S.C. § 1983 and 42 U.S.C. § 1985. They also asserted state-law tort claims of assault and battery, negligence, and outrageous conduct. The § 1985 conspiracy claim was dismissed at the summary judgment stage and the Nolans do not appeal that ruling. Similarly, the Nolans do not appeal the district court's grant of a judgment as a matter of law in favor of Johnson and Hicks, dismissing the Nolans' claims against those defendants in their individual capacities. (ROA Tr. 122-23, 458-60.) Finally, the Nolans have not appealed the jury's verdicts in favor of Superintendent Johnson and Principal Hicks in their official capacities. Accordingly, no issues regarding Principal Hicks or Superintendent Johnson's liability are before this Court.

On appeal, the Nolans contend that the district court erred in denying their new trial motion because: (1) no reasonable juror could have found for defendant Memphis City Schools on the negligence claim, for defendants Anderson and Henry on the assault,

battery and outrageous conduct claims, and for defendants Anderson, Henry and the Memphis city schools on the § 1983 claims; (2) the jury instruction on the constitutional tort claim was in error; and (3) the court erred in its evidentiary rulings at trial by refusing to permit the Nolans to call Superintendent Johnson in rebuttal and by excluding testimony regarding why Anderson and Hicks were no longer working for Hamilton. Defendants Anderson, Henry, and the Memphis City Schools argue that the jury's verdicts were reasonable and the district court's jury instructions and evidentiary rulings proper.

## II. JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because the Nolans' 42 U.S.C. § 1983 claims arose under federal law. The district court had supplemental jurisdiction over the related state law claims under 28 U.S.C. § 1367. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## III. STANDARD OF REVIEW

The Nolans challenge the district court's denial of their new trial motion based on the reasonableness of the jury's verdicts and the propriety of the court's constitutional tort jury instruction and evidentiary rulings. This Court reviews a district court's denial of a party's motion for a new trial under an abuse of discretion standard. *Morgan v. New York Life Ins. Co.*, 559 F.3d 425, 434 (6th Cir. 2009). Reversal is only warranted if the Court has a "definite and firm conviction that the trial court committed a clear error of judgment." *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 820 (6th Cir. 2000).

A court can set aside a jury's verdict and grant a new trial if the verdict is against the clear weight of the evidence; however, a new trial may not be granted on that basis unless the verdict was unreasonable. *Taylor v. TECO Barge Line, Inc.*, 517 F.3d 372, 383 (6th Cir. 2008). Therefore, "if a reasonable juror could reach the challenged verdict, a new trial is improper." *Barnes*, 201 F.3d at 821. A verdict is not unreasonable merely

because other inferences or conclusions could have been drawn or because other results are more reasonable. *Strickland v. Owens Corning*, 142 F.3d 353, 357 (6th Cir. 1998).

Similarly, a district court's refusal to give a jury instruction is reviewed under an abuse of discretion standard. *Taylor*, 517 F.3d at 387. The Court considers the jury instructions as a whole "to determine whether they fairly and adequately submitted the issues and applicable law to the jury." *Arban v. West Pub. Corp.*, 345 F.3d 390, 404 (6th Cir. 2003). A new trial is not required based on flaws in the jury instructions "unless the instructions, taken as a whole, are misleading or give an inadequate understanding of the law." *Id.*

Finally, this Court reviews a district court's evidentiary rulings for abuse of discretion. *Taylor*, 517 F.3d at 378. Even if a district court's evidentiary ruling is erroneous, a new trial is not warranted if the abuse of discretion constituted harmless error. *Id.*; *see Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 514 (6th Cir. 1998) ("Even if a mistake has been made regarding the admission or exclusion of evidence, a new trial will not be granted unless the evidence would have caused a different outcome at trial."). "Broad discretion is given to district courts in determinations of admissibility . . . and those decisions will not be lightly overturned." *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 897 (6th Cir. 2004).

## IV.  LAW & ANALYSIS

### A.  Reasonableness of the Jury's Verdicts

#### *1. Assault and Battery*

The Nolans contend that they were entitled to a new trial because no reasonable jury could have entered a verdict for Anderson and Henry on their assault and battery claims. Under Tennessee law, "assault" is defined as "any act tending to do corporal injury to another, accompanied with such circumstances as denote at the time an intention, coupled with the present ability, of using such actual violence against that person." *Huffman* v. *State*, 292 S.W.2d 738, 742 (Tenn. 1956) (overruled on other grounds by *State v. Irvin*, 603 S.W.2d 121, 123 (Tenn. 1989)); *see also Vafaie v. Owens*,

No. 92C-1642, 1996 WL 502133, at *3 (Tenn. Ct. App. Sept. 6, 1996) (same). "Battery" is defined as "a touching of the person [of an individual] or something intimately associated with, or attached to, his person for an unlawful purpose." *Lewis v. Metro. Gen. Sessions Ct. for Nashville*, 949 S.W.2d 696, 703 (Tenn. Crim. App. 1996) (quoting *Huffman*, 292 S.W.2d at 742).

By statute, a public school teacher in Tennessee is permitted to use corporal punishment "in a reasonable manner against any pupil for good cause in order to maintain discipline and order within the public schools." Tenn. Code Ann. §49-6-4103. The Tennessee Supreme Court has held that if corporal punishment is "moderate and is inflicted with a proper instrument the teacher is as a rule, not liable civilly for assault and battery." *Marlar v. Bill*, 178 S.W.2d 634, 635 (Tenn. 1944) (internal quotation marks omitted) (holding teacher who searched a student and principal who inflicted slight punishment with a ruler were not liable for assault and battery.)  If the punishment is "excessive," however, a teacher is potentially subject to civil liability. *See, e.g., id.* at 635 (stating "[o]f course, there must be no malice and there must be reasonable ground and the punishment must not be excessive"); *Paul v. McGhee*, 577 F.Supp. 460, 461 (E.D. Tenn. 1983) (noting that Tennessee law preserves the right of the child not to be subjected to excessive punishment).  The determination of whether corporal punishment was administered in a reasonable manner is a question of fact for the jury. *Hargrove v. York*, No. 01-A-01-9202-CV00065, 1993 WL 18267, at *3 (Tenn. Ct. App. Jan. 29, 1993).

The Nolans argue that any reasonable juror was compelled to find that Henry committed assault and battery because Henry admitted that he paddled Martin for non-disciplinary reasons, including failure to perform basketball skills properly and poor grades.  With respect to Anderson, they point out that Martin testified that Anderson punched him in the chest with a closed fist and repeatedly paddled him painfully.  They also note that, even though Anderson could not specifically recall paddling Martin, Superintendent Johnson testified that she believed Anderson violated the school's corporal punishment policy by paddling basketball players for missing shots during

games and suspended him from coaching as a result.  (ROA Tr. 147-48.)

We first address the assault and battery claim against Henry.  Henry admitted that he paddled Martin "on a few occasions [sic] teacher referrals and misbehavior during a practice, and I guess not focusing on the practice itself."  "Not focusing" meant "not paying attention to what was going on or what he should be doing" and ". . . some of the kids were his friends and they might be horsing around" while "in the middle of functions or drills."  Henry also admitted paddling Martin infrequently for not using the proper technique in performing a basketball maneuver after he had been shown the technique several times.  Henry additionally testified:

> Q.[By plaintiffs' counsel]      Okay. Now have you - - let's see, first off, other reasons that paddlings were administered, are you aware or did you yourself administer paddlings because of poor grades or poor conduct grades?
>
> A.      One or two occasions I had to give Martin corporal punishment because teachers had sent him to me.
>
> * * *
>
> Q.      Okay.  Now my question again is, did you ever administer corporal punishment to Martin because of his report card, because his grades or poor conduct on his report cards?
>
> A.      In the three years maybe once or twice.
>
> Q.      So the answer is yes?
>
> A.      Yes.
>
> Q.      Okay.  And have you ever witnessed Ted Anderson administering paddlings to Martin for bad grades or bad conduct grades on his report card?
>
> A.      Conduct yes, grades I believe so.
>
> [Colloquy establishing that Henry observed this more than one time over three years, but could not say more than five times, because he "just didn't know."]
>
> * * *

Q. [By defense counsel]     And this last year that Martin Nolan was at Hamilton, that 2003-2004 year, were you in an administrative position at Hamilton in addition to your coaching duties?

A.     Yes, sir.

* * *

Q.     All right. Was Martin ever sent to you by a teacher to be paddled for something that he had done in class?

A.     Yes, sir.

Q.     And would you administer the punishment?

A.     Yes, sir.

* * *

Q.     What - - did - -  did you have a philosophy or a method of your own coach or coaching style?

A.     Yes, I do. I believe that all kids are born smart, they learn to do things that get them in trouble, that's including the coaching aspect. I'm pretty patient and I let them make mistakes because that's how they learn. If you shoot a ball and you miss, that's a part of it. But working with the technique, even with that I give you an opportunity to self correct or self adjust after I've told you, pointed out things.

* * *

Q.     Were - - were there occasions when you would have Martin leave a practice?

A.     Yes. On several occasions toward the end of his - -  well, in [the] middle of his junior year after I would talk to Martin and try to get him to do his best all the time and see - - saw that it was not working, I would say, well, Martin, when you get ready, you let me know, but right now go get dressed, you don't have to practice today.

* * *

Q.     Do you know how many times during the three years that Martin Nolan was part of the Hamilton basketball program that you actually administered a paddling to him?

A.     Maybe ten times in two and a half years.

Q.     All right. How many of those would have been related to basketball as opposed to a teacher sending you a note regarding something happening in school?

A.     Maybe 70 percent basketball, 30 percent teacher referrals.

Taken as a whole, the jury could have understood this testimony to mean that Henry paddled Martin on several occasions because Martin was referred by teachers based on his conduct during class, that Henry might have paddled him once or twice for a bad conduct grade on his report card, and that he also paddled him occasionally for improper basketball techniques when he perceived the improper techniques were the product of Martin's not paying attention or horsing around during practice. The jury could have rejected Martin's account of the paddlings and concluded that plaintiffs failed to establish by a preponderance of the evidence that Henry paddled Martin for bad academic grades, as distinguished from bad conduct grades, or for deficiencies in his basketball performance unrelated to issues of discipline and order during practice. Thus, the district court did not abuse its discretion in denying the motion for new trial as to the assault and battery claim against Henry.

As to Anderson, the evidence was not sufficient to show that Anderson violated the school's policy on corporal punishment. Plaintiffs were required to show that Anderson committed the tort of assault and battery on Martin. After admitting that he and Henry administered paddlings for bad grades on report cards to emphasize the importance of academics, Anderson testified:

> Q.[By plaintiffs' counsel]    But you did paddle Martin on several occasions for bad grades, correct?
>
> A.     Several, maybe several, but I paddled Martin very rarely because Martin was a good kid, and I presume still is, Martin didn't cause a lot of problems.
>
> I sit [sic] here yesterday in disbelief with the number of paddlings that we were accused of. I rarely had to paddle Martin. Martin was a good kid, he didn't get into trouble and he made good grades, so there wouldn't have been any reason for me to paddle him.
>
> * * *
>
> Q.     Okay. Now so how often, since we got a little bit of reverse testimony here, Martin saying two or three times a week and you saying rarely, about how often did you paddle Martin according to you?

A.     Maybe three times during his whole tenure at Hamilton High School.

Q.     During three years from the ninth to the eleventh grades you paddled him three times?

A.     I'm saying three, sir.  I actually right here don't even recall having ever paddled Martin, I really don't, because Martin never got in - - I wouldn't have had any reason to paddle Martin.  Martin was a good kid, he never got in any trouble, not a teacher every [*sic*] sent me anything that I can recall on Martin.

* * *

Q.     So now it's your testimony that you don't recall ever paddling Martin?

A.     I don't recall it, but I may have.  I mean, I can't just remember a time - -  this is a time that I remember getting - -  paddling Martin, I just can't pick a time out of my head that I remember paddling Martin.  But I - -  I would say that I probably did, you know, but I don't know, you know, as far as in excess of any exorbitant number, no, sir, I didn't.

* * *

Q.     And your program includes paddling the basketball players, correct?

A.     It includes paddling the basketball players for misbehaving mostly, yes, sir.  If they misbehave, yes, sir.

As with Henry, the jury could have rejected Martin's account of the paddlings, and reasonably concluded that Anderson's admissions did not establish that he in fact paddled Martin for non-disciplinary reasons.

As to the paddlings themselves, there was ample evidence presented at trial suggesting that Anderson and Henry's administration of corporal punishment was not excessive and, therefore, did not give rise to civil liability for assault and battery.[1]  As a threshold consideration, the jurors were free to credit Anderson's testimony that he

---

[1] While not necessarily "excessive" under the existing law, we note that current data, and indeed the modern trend, strongly suggest that the use of corporal punishment in schools is counterproductive. Deana Pollard Sacks, *State Actors Beating Children: A Call for Judicial Relief*, 42 U.C. Davis L. Rev.1165, 1200 (2009) ("Social science research has established positive correlations between corporal punishment and subsequent antisocial, violent, and criminal behavior by children subjected to it.").  This fact is apparently recognized by the majority of states, which have banned paddling in public schools. *See id.* at 1170 n.8.

never punched Martin and that he only paddled Martin at most three times in a two-and-a-half year period.  Similarly, Henry testified that he only paddled Martin a total of ten times during Martin's tenure at Hamilton.  The jury could also find credible Anderson and Henry's testimony that they never struck a student, including Martin, more than three times in a paddling session and Henry's assertion that he did not hit hard.  Furthermore, the Nolans stipulated that Martin "was not seriously injured" from the paddlings, which supports the conclusion that the paddlings were not excessive.

The defense also presented evidence from which the jury could reasonably conclude that Anderson and Henry did not paddle Martin out of malice.  *See Hargrove*, 1993 WL 18267, at *3 (noting that a teacher may be liable where he abuses his disciplinary power as a cover for malice).  Anderson testified that basketball players were primarily paddled for misbehavior, that he paddled students for poor grades because of the great importance of academics to the basketball program, and that he very rarely paddled for poor performance.  (ROA Tr. 249-52, 283-84.)  He also testified that he "paddled Martin very rarely because Martin was a good kid . . . he didn't get into trouble and he made good grades."  (ROA Tr. 251.)  Henry testified that he paddled Martin based on misbehavior at practice, bad grades or conduct on his report card, and teacher referrals for misbehavior in other classes.  (ROA Tr. 168-69, 172-73.)  Finally, the record supported that Anderson and Henry administered corporal punishment with a "proper instrument," i.e., a wooden paddle known as "the wood."  (ROA Tr. 168, 233-34.)

From all of the evidence, a reasonable juror could conclude that the paddlings administered by Anderson and Henry were for disciplinary purposes, and were not "excessive" in severity, frequency, motivation, or means.  Therefore, the district court acted within its discretion by denying the Nolans' motion for a new trial because a reasonable juror could have found that Anderson and Henry were not liable for assault and battery.

*2. Corporal Punishment Substantive Due Process Claims under § 1983*

The Nolans argue that they should have been granted a new trial because no reasonable juror could have entered a verdict for defendants Anderson, Henry, or the Memphis City Schools on their substantive due process claim under 42 U.S.C. § 1983. The threshold question in a § 1983 claim is whether the plaintiff has been deprived of a right "secured by the Constitution and laws." *Lillard v. Shelby Cty. Bd. Of Educ.*, 76 F.3d 716, 724 (6th Cir. 1996) (quoting *Baker v. McCollan*, 443 U.S. 137, 140 (1979), internal quotation marks omitted). Like all individuals, public school students have a Fourteenth Amendment liberty interest in freedom from bodily injury. *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987).

To demonstrate that Anderson and Henry's use of corporal punishment at school violated Martin's Fourteenth Amendment substantive due process rights, however, the Nolans were required to prove that "the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Id.*; *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 699 (6th Cir. 2006). As discussed *supra*, the severity and frequency of, as well as the motivation for, Martin's paddlings were contested at trial.

On appeal, the Nolans argue that Anderson's and Henry's administration of corporal punishment "cause[d] severe injury to Martin, including both physical pain and psychological injury." (Appellants' Br. 21.) At trial, however, the Nolans stipulated that Martin was not seriously injured. (ROA Tr. 555.) They also failed to produce medical evidence that any physical injury resulted from the paddlings.

Furthermore, there was sufficient evidence presented to support the jury's conclusion that Anderson's and Henry's actions did not cause severe, conscience-shocking injury, were not motivated by malice, and, therefore, did not rise to the level of a substantive due process violation. Anderson and Henry both testified that they rarely paddled Martin and that when they did so they never exceeded a "three lick"

maximum number of blows.  Henry explained that when he paddled students he did not hit hard.  Anderson testified that he never punched Martin, did not swear at him excessively, and that he apologized to Martin and his family in the one instance where he did swear at Martin.  Anderson also testified that if Martin's father had complained about the paddling or if he thought that the paddling was harming Martin, he would have stopped paddling him. (ROA Tr. 263.)  Martin's testimony contradicted Anderson's and Henry's, but Martin himself admitted that he never sought medical treatment for physical injuries resulting from the paddlings and that in all but one instance, when he needed to ice his hand, he was able to participate in basketball practice following a paddling. (ROA Tr. 67, 110-11.)

The Nolans also produced scant evidence of significant psychological injury stemming from the paddling.  Dr. Scott testified that Martin came to see her not only because of issues regarding the basketball team, but also because he was concerned about his relationship with his father. (ROA Tr. 215-16.)  Based on her testimony, then, the jury could have made the reasonable inference that Martin's symptoms were as least partially attributable to his parental relationship, rather than a pure result of his experiences with Coaches Anderson and Henry.  Additionally, Dr. Scott testified that Martin was suffering from symptoms that are common among teenagers, i.e., mild depression, low self-esteem, and low confidence. (ROA Tr. 217, 223.)  Moreover, she gave him a diagnosis which indicated that she expected those symptoms to last no longer than six months. (ROA Tr. 217, 221.)

Next, plaintiffs argue that the application of force by Anderson and Henry was disproportionate because there was no need to apply force for non-disciplinary reasons. Even if the jury believed that Martin was paddled for a non-disciplinary reason, however, it could still reasonably conclude from the evidence presented that the paddling did not "shock the conscience" and that the resulting injury was too minor to rise to rise to the level of a constitutional violation. *See Lillard*, 76 F.3d at 725-26 (even though it was made for no legitimate purpose, teacher's single slap of a student did not result in physical injury and did not rise to the level of a substantive due process violation);

*compare Webb*, 828 F.2d at 1154, 1159 (allegation that high school principal broke down a student's door, threw the student into a wall, threw her onto the floor, and slapped her sufficient to survive summary judgment on substantive due process claim) *and Pendergrass*, 455 F.3d at 700 (allegations that substitute teacher grabbed an elementary student, slammed her head into the blackboard, threw her on the ground, and choked her for a full minute for forgetting to bring a pencil to class, after which the student exhibited petechiae, neck contusions, and symptoms of post-traumatic stress disorder, could meet the "shocks the conscience" standard); *with Archey v. Hyche*, Nos. 90-5631, 90-5863, 1991 WL 100586, at *3-4 (6th Cir. 1991) (plaintiffs failed to state a claim for substantive due process violation where fifth grade student received five swats with a paddle for humming in the boy's bathroom, resulting in severe bruises and an impaired gait).

From a review of the record, a reasonable juror could have concluded that the paddlings that Martin endured at the hands of Anderson and Henry did not result in a severe injury and did not amount to a "brutal and inhumane abuse of official power" that shocks the conscience. Therefore, the district court properly denied the Nolans' motion for a new trial based on its § 1983 claims against Anderson, Henry and the Memphis City Schools.

### 3. *Outrageous Conduct*

The Nolans also argue that no reasonable juror could have found for defendants Anderson and Henry on their outrageous conduct claims. To establish a claim for outrageous conduct, a plaintiff must prove that: (1) the defendant's conduct was intentional or reckless; (2) the conduct was "so outrageous that it is not tolerated by civilized society;" and (3) the defendant's conduct resulted in "serious mental injury." *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). Malicious intent alone is insufficient to constitute a violation. *Id*. at 623. Rather, to constitute "outrageous conduct" a defendant's act must have been "so outrageous in character and so extreme in degree, as to go beyond all bounds of decency, at to be regarded as atrocious and utterly intolerable in a civilized society." *Id*.

The Nolans contend that paddling a high school student for a non-disciplinary reason cannot be tolerated in a civilized society. The jury, however, was entitled to draw a different conclusion. *Strickland*, 142 F.3d at 357. As with the § 1983 claims, which are evaluated under a comparably demanding standard, the jury in this case was free to believe the defendants' version of events and could reasonably conclude that the paddlings administered by Anderson and Henry were not outrageous.

The Nolans claim that the paddlings "resulted in mental injury serious enough to warrant the diagnosis of a mental disorder." (Appellants' Br. 19-20.) But, given Dr. Scott's testimony, it would not have been unreasonable for the jury to conclude that Martin's mild depression and low-self esteem were at least equally a result of his relationship with his father. Similarly, the jury could have reasonably concluded that the mental injury diagnosed by Dr. Scott was not serious, as her diagnosis pointed to relatively short-lived and mild symptoms that were common among teenagers. Moreover, the jury could have simply taken the Nolans at their word as Martin's father admitted that Martin "was not seriously injured." (ROA Tr. 555.) There was sufficient evidence to support the jury's conclusion that Anderson's and Henry's conduct was not outrageous and that Martin did not suffer a serious mental injury. Accordingly, the district court's denial of a motion for new trial on the outrageous conduct claims was proper.

### *4. Negligence*

The Nolans also argue that they were entitled to a new trial because no reasonable juror could have entered a verdict for the Memphis City Schools on their negligence claim. The Tennessee Governmental Tort Liability Act immunized from suit any injury resulting from the activities of governmental entities, subject to statutorily enshrined exceptions. Tenn. Code Ann. §29-20-2001(a); *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 79 (Tenn. 2001). A negligence claim may be brought against a governmental entity, such as the Memphis City Schools, pursuant to section 29-20-205. *Limbaugh*, 59 S.W.3d at 79. That section states in pertinent part:

> Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of:
>
> (1)    the exercise or performance or the failure to exercise or perform a discretionary function whether or not the discretion is abused;
>
> (2)    . . . infliction of mental anguish, invasion of right of privacy, or civil rights . . . .

Tenn. Code Ann. § 29-20-205.  In this case, any injury suffered by Martin was caused by Anderson's and Henry's intentional infliction of corporal punishment.  A governmental entity is only liable for the intentional torts of its employees where the plaintiff's injuries were "proximately caused by its negligence in failing to exercise reasonable care to protect [the plaintiff] from the foreseeable risk of an employee's intentional [tort]." *Limbaugh*, 59 S.W.3d at 76.  The Nolans argue that Principal Hicks was negligent in failing to prevent Anderson and Henry from paddling Martin and that his negligence is attributable to the Memphis City Schools.  In support, they point to Henry's testimony that basketball players had been paddled at Hamilton for 40 years and that Hicks had been at Hamilton for 12-15 years.

Despite Henry's testimony, the evidence at trial was not so one-sided that it precluded a judgment in favor of the Memphis City Schools.  Principal Hicks testified that he had no knowledge that basketball players were being paddled for other than disciplinary reasons during the time that Martin was on the Hamilton team.  (ROA Tr. 371-73.)  Both Mr. Nolan and Martin testified that they did not complain to Principal Hicks or any other Hamilton administrator regarding the paddlings before Martin stopped playing basketball for Hamilton.  (ROA TR. 82-83, 347, 349-50, 352.)  Principal Hicks testified that the first complaint he ever received regarding Anderson's techniques came from Martin in December of 2003 following the Los Angeles incident.  (ROA Tr. 378.)   He also testified that he instructed faculty to follow Hamilton's corporal punishment policy and worked to enforce the policy.  (ROA Tr. 379.)  Furthermore, Mr. Nolan testified that he was satisfied with the response he received from Hicks when he met with him following the Los Angeles incident.  (ROA Tr. 352.)  Mr. Nolan also

admitted that after he met with Hicks to voice his concerns regarding Anderson's use of bad language, Anderson never again used foul language to Martin or administered corporal punishment to Martin.  (ROA Tr. 356.)  A reasonable juror could have concluded that, based on the lack of any complaints regarding Anderson's and Henry's conduct, and the other testimony described above, Principal Hicks, and therefore the Memphis City Schools, had no reason to foresee that Anderson or Henry posed a danger to Martin and that Principal Hicks exercised reasonable care in protecting Martin from improper corporal punishment.  Consequently, the district court did not abuse its discretion when it denied the Nolans' motion for a new trial on the negligence claim.

## B. Constitutional Tort Jury Instruction

The Nolans argue that the jury was not properly instructed on their substantive due process claim.  At trial, the district Court gave the following instruction on the § 1983 substantive due process claim:

> In order for plaintiff to establish that defendant Theodore Anderson and/or Eldridge Henry's actions against Martin Nolan violated his constitutional rights, the plaintiff must first show that Martin Nolan suffered an injury so severe that it violated his constitutional rights.  In order to prove such an injury the plaintiff must demonstrate by a preponderance of the evidence that:
>
> (1) Coach Anderson's or Coach Henry's application of force caused severe injury to Martin Nolan; and
>
> (2) The force or aggression applied by Coach Anderson or Coach Henry was disproportionate to the need presented; and
>
> (3)  The force or aggression applied was inspired by malice or sadism rather than a merely careless or unwise excess of zeal, which amounted to brutal and inhumane abuse of official power literally shocking to the conscience.
>
> If Martin Nolan failed to prove any of these three elements, you must find that he has not suffered a constitutional injury.
>
> It is also important that you consider that corporal punishment for discipline is legal in the State of Tennessee and was allowed at all times relevant to this case in the Memphis City Schools.

(ROA Tr. 557-58.) The Nolans contend that the instruction as given was misleading to the jury. They argue that the district court abused its discretion by refusing to replace subpart (1) of the instruction with the following language:

> (1) Coach Anderson's or Coach Henry's application of force was "continuous, severe, and pervasive" or "administered repeatedly in a highly visible setting designed to demean and embarrass an individual in a highly vulnerable position."

The quoted language in the proposed instruction was drawn from the district court's analysis of the constitutional tort claim in its summary judgment order. The Nolans also argue that the district court erred by refusing to delete the last paragraph of the disputed instruction and by refusing to include the definition of "severe" in its instructions. Contrary to the Nolans' contentions, the jury instruction as given was proper. Jury instructions are proper if, as a whole, they "fairly and adequately submitted the issues and applicable law to the jury." *Arban*, 345 F.3d at 404. The constitutional tort instruction in this case does so. The language used by the district court is an accurate and nearly verbatim statement of this Circuit's "shocks the conscience" test for substantive due process claims as announced in *Webb v. McCullough*. 828 F.2d at 1158. The Nolans offer no support for their proffered instruction other than the language used by the district court in denying summary judgment. Similarly, the last paragraph of the instruction is an accurate statement of law based on Tennessee's corporal punishment statute. Tenn. Code Ann. §49-6-4103. The district court correctly added the words "for discipline" in response to the Nolans' objection. Further, it was not necessary to define the word "severe." Consequently, the district court did not abuse its discretion either by giving the instruction or by denying the Nolans' motion for new trial on this ground.

## C.  Evidentiary Issues

### 1.  Recall of Dr. Johnson

The Nolans argue that the district court abused its discretion by refusing to allow them to call Superintendent Johnson a second time to rebut testimony from other witnesses that no one other than the Nolans had ever complained about Anderson and

Henry.  This Court will only overturn a district court's evidentiary decisions if we are "firmly convinced that a mistake has been made."  *Morales*, 151 F.3d at 516.  The Nolans claim that Johnson would have testified consistent with her prior public statements, that "there exists at Hamilton High an environment that either ignores or condones sexual harassment between students and staff and promotes a climate of fear and intimidation that threatens the safety and well-being of the student body and staff." (ROA Tr. 424.)  They argue that they were entitled to recall Johnson and present this testimony under Federal Rule of Evidence 607, which allows a party to attack the credibility of its own witnesses.  It is undisputed, however, that Johnson's statements involved allegations of sexual harassment and were made in the context of another case, rather than referring to Coach Anderson's and Henry's use of corporal punishment within the Basketball program.  (ROA Tr. 424-29.)  Therefore, the district court acted well within its discretion by excluding that testimony under Federal Rule of Civil Procedure 403 as more prejudicial than probative.

## 2. *Exclusion of Testimony Regarding Why Hicks and Anderson Were No Longer Assigned to Hamilton*

The Nolans argue that the district court erred in excluding testimony regarding the reasons that Principal Hicks and Coach Anderson were no longer assigned to teach at Hamilton.  The district court excluded this testimony as evidence of subsequent remedial measures under Federal Rule of Evidence 407.  (ROA Tr. 8-12.)  Under Rule 407, evidence of subsequent remedial measures that would have "made the injury or harm less likely to occur . . . is not admissible to prove negligence [or] culpable conduct."  Fed. R. Evid. 407.  Evidence that an employer subsequently discharged an employee accused of causing a plaintiff's injury may be properly excluded as a subsequent remedial measure under Rule 407.  *Hull v. Chevron U.S.A., Inc.*, 812 F.2d 584, 586-87 (6th Cir. 1987); 23 Charles Alan Wright, Kenneth W. Graham, Jr., Federal Practice & Procedure, § 5284.  The Nolans have not asserted a permissible purpose for introducing the testimony.  They explain that the excluded testimony would have shown that Hicks was forced to resign due to his failure to report allegations by a parent about an adult's inappropriate relationship with a student.  (Appellants' Br. 27.)  They claim

Memphis City School's liability hinges on its knowledge of inappropriate activities by faculty and that the excluded evidence established that Principal Hicks had a pattern of failing to report inappropriate relationships between adults and students. However, this evidence does little to prove that Hicks was aware of violations of the corporal punishment policy during the relevant time period.

The Nolans also claim that the excluded testimony would have shown that Anderson was transferred to another school and barred from coaching as a result of Johnson's conclusion that he had violated the corporal punishment policy in association with the facts giving rise to this suit. A review of the record, however, shows that plaintiffs' counsel did, in fact, question Dr. Johnson on this issue. Further questioning on recall would have been cumulative.

## V. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.