RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0231p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

─────────────────

STACKPOLE INTERNATIONAL ENGINEERED PRODUCTS, LTD.,

*Plaintiff-Appellee*,

*v.*

ANGSTROM AUTOMOTIVE GROUP, LLC; ANGSTROM PRECISION METALS, LLC,

*Defendants-Appellants*.

No. 21-1733

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:17-cv-13748—Robert H. Cleland, District Judge.

Decided and Filed: October 24, 2022

Before: SUTTON, Chief Judge; BOGGS and KETHLEDGE, Circuit Judges.

─────────────────

**COUNSEL**

**ON BRIEF:** Marc L. Newman, Devon P. Allard, THE MILLER LAW FIRM, P.C., Rochester, Michigan, for Appellants. Jason D. Killips, Jonathan F. Jorissen, BROOKS WILKINS SHARKEY & TURCO, Birmingham, Michigan, for Appellee.

─────────────────

**OPINION**

─────────────────

SUTTON, Chief Judge. Stackpole International ordered more than $1 million in car parts from Angstrom Automotive Group ("Angstrom Automotive") and Angstrom Precision Metals ("Precision Metals") (collectively, "Angstrom"). When Angstrom refused to deliver the parts, Stackpole sued for breach of contract. After motions practice, discovery, and a three-day trial, a Michigan jury sided with Stackpole. So do we.

I.

Stackpole makes car parts, including transmission and engine oil pumps. Precision Metals makes automotive subcomponents—parts for parts—including transmission and engine oil "pump shafts." Angstrom Automotive is a management company that oversees Precision Metals.

In 2014, Stackpole asked an Angstrom Automotive employee for quotes on prices of "10R/10L" and "Nano" pump shafts. A Precision Metals employee responded with quotes. Both quotes made "[a]cceptance of order" "subject to APQP Review with Stackpole International." R.51-7 at 2; R.51-8 at 2. "APQP Review" means "Advanced Product Quality Planning Review," a form of "advanced planning done to make sure" that a manufacturing program proceeds "on track." R.103 at 8.

Stackpole issued a "Letter of Intent" to Angstrom Automotive. R.51-10 at 2. The letter specified that Stackpole would buy 1.1 million 10R/10L shafts for $1.66 each and 306,000 Nano shafts for $3.08 each. And it gave Stackpole a three-year, 1.5% discount on other "T70" shafts that it was already planning to buy. *Id.* An Angstrom Automotive employee signed the letter as "VP, Business Development" for "Angstrom Automotive Group." *Id.* at 3.

The Letter of Intent also provided that Stackpole would issue "purchase orders . . . for each part" to "allow for actual shipments." *Id.* By early 2015, Stackpole had sent Angstrom the purchase orders. They contained six pages of supplemental terms, including a term allowing Stackpole to "terminate . . . this contract, at any time and for any reason, by giving written notice," R.51-15 at 7; R.51-16 at 9, and a term providing that the purchase orders would "not become binding" until the additional provisions were "signed and returned." R.51-15 at 4; R.51-16 at 6.

While neither Precision Metals nor Angstrom Automotive signed the purchase orders, Precision Metals quickly began shipping parts to Stackpole. It continued to do so for the next two years without incident and consistent with the Letter of Intent.

But in 2017, Precision Metals realized that it could no longer produce Stackpole's shafts profitably under the contract's prices. It told Stackpole that it needed a price increase or it would have to halt production. As Precision Metals and Angstrom Automotive explained, they had premised their original contract on the assumption that they would later shift to an automatic (and more efficient) production process. And as they frame things, Stackpole had unreasonably withheld approval to make the change. Negotiations followed in April, May, and June 2017. But in the interim, in Stackpole's telling, Precision Metals' threat to stop shipments had created a "commercial version of a hostage situation." R.101 at 14. If Precision Metals had stopped shipping shafts, Stackpole would have been forced to stop shipping pumps. That, in turn, would have seriously disrupted the automotive supply chain. Instead of triggering this "nuclear option," *id.*, Stackpole agreed to Angstrom Automotive's price increases "under duress and protest." R.56-27 at 3.

In November 2017, Stackpole sued Angstrom Automotive and Precision Metals for breach of contract. Precision Metals counterclaimed, alleging that Stackpole had impermissibly withheld its approval to make the parts by an automatic rather than manual process. The district court awarded summary judgment to Stackpole on the counterclaim. It also held that Stackpole, Angstrom Automotive, and Precision Metals had formed a contract for parts that was "for successive performances" and "indefinite in duration." R.61 at 18. Michigan law makes such contracts presumptively terminable upon "reasonable notification," Mich. Comp. L. §§ 440.2309(2), (3), prompting a jury trial over whether Angstrom had offered Stackpole reasonable notice of termination when it threatened to cut off Stackpole's shipments.

After a three-day trial, a jury found in favor of Stackpole, awarding it roughly $1 million in damages. Angstrom Automotive and Precision Metals timely appealed.

II.

Most of this appeal turns on whether the district court's legal rulings at summary judgment were correct. For the reasons that follow, we think they were.

The parties agree that Michigan law governs and that pump shafts are "goods" subject to Michigan's Uniform Commercial Code. *See* Mich. Comp. L. § 440.2105(1); *see also Klaxon v.*

*Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  That means partial summary judgment for Stackpole was proper if, as a matter of law, the parties entered an enforceable contract terminable only with reasonable notice.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  So too in the other direction.  Summary judgment against Precision Metals' counterclaim was proper if, as a matter of law, Stackpole had no duty to approve the request for automatic manufacturing.  *Id.*

A.

*Stackpole's breach of contract claim.*  Stackpole's affirmative claim against the Angstrom entities raises four questions.  Did Stackpole ever form a contract with Precision Metals?  If so, did that contract bind Angstrom Automotive too?  If there was a contract, did Stackpole's failure to pursue advanced quality planning with Precision Metals release either Angstrom party from its contractual obligations?  And did any such contract entitle Stackpole to reasonable pre-termination notice?  We answer each question in Stackpole's favor.

*Contract formation—Precision Metals.*  The Letter of Intent constitutes a binding contract between Stackpole and Precision Metals.  Under Michigan law, contracts arise when (1) competent parties bargain over (2) a "proper subject matter," so long as (3) "consideration," (4) "mutuality of agreement," and (5) "mutuality of obligation" support the deal they strike. *AFT Mich. v. Michigan*, 866 N.W.2d 782, 804 (Mich. 2015).  Mutuality of obligation means "consideration," *Hall v. Small*, 705 N.W.2d 741, 744 (Mich. Ct. App. 2005), and the parties do not contest competency or subject matter.  That leaves consideration and mutuality of agreement for discussion.

"Consideration" means a "bargained-for exchange," as opposed to a gift or gratuity. *Gen. Motors Corp. v. Dep't of Treas., Revenue Div.*, 644 N.W.2d 734, 738 (Mich. 2002).  Mutuality of agreement requires "assent" to an exchange's "material" terms.  *See Kamalnath v. Mercy Mem'l Hosp. Corp.*, 487 N.W.2d 499, 503 (Mich. 1992).  A party assents to an exchange when his "express words" and "visible acts" make it reasonable to infer an intent to be bound to a contract.  *Id.*  And his assent covers a bargain's material elements when it "set[s] forth" the "promises and performances to be rendered . . . with reasonable certainty."  *Nichols v. Seaks*, 295

N.W. 596, 598 (Mich. 1941). Put differently, a contract may have "open" terms so long as it creates "a reasonably certain basis for giving an appropriate remedy" after breach. Mich. Comp. L. § 440.2204(3).

The Letter of Intent ticks these boxes. Precision Metals sold Stackpole parts for cash. That amounts to a "bargained-for exchange" rather than a charitable donation. *Cf. Gen. Motors*, 644 N.W.2d at 738. Its decision to ship shafts to Stackpole manifested intent to be bound. *See Sanchez v. Eagle Alloy, Inc.*, 658 N.W.2d 510, 517 (Mich. Ct. App. 2003) (explaining that a party may accept an agreement by performing in accordance with its terms); *accord* Mich. Comp. L. § 440.2204(1). By setting out which parts Precision Metals would provide to Stackpole and how much Stackpole would pay for them, the Letter of Intent also "set forth" Stackpole and Precision Metals' obligations with "reasonable certainty." *Calhoun Cnty. v. Blue Cross Blue Shield Mich.*, 824 N.W.2d 202, 212 (Mich. Ct. App. 2012); *see, e.g.*, *Alderton v. Williams*, 102 N.W. 753, 754 (Mich. 1905) (holding that contract to remodel heading mill into stave-mill was enforceable even though it did not specify "what kind of machinery [was] to be bought, or what kind of staves manufactured").

Angstrom's objections do not move the needle off this conclusion. Angstrom points out that Stackpole also sent purchase orders that purported not to be binding until signed. But the Letter of Intent, not the purchase orders, is the thread that ties Precision Metals to Stackpole. True, the Letter of Intent said that Stackpole would send purchase orders to "allow for actual shipments." R.51-10 at 3. But nothing in the letter required Precision Metals to sign the purchase orders or to otherwise assent to them.

Angstrom insists that it never agreed with Stackpole about how to manufacture the shafts, proving that the Letter of Intent lacked mutuality. Yet many contracts, indeed most contracts, omit similar details. When consumers purchase Ford F-150s, the contracts do not lay out how Ford organizes its production lines. So also when people or businesses purchase many products and parts. Angstrom does not explain why Stackpole's contract is different or why it deprived the district court of a reasonable basis for fashioning a remedy.

Angstrom objects that Stackpole's purchase orders gave Stackpole unilateral termination rights "at any time and for any reason," R.51-15 at 7; R.51-16 at 9, suggesting that the contract lacked consideration. Again, though, the Letter of Intent, after two years of performance under it, binds Precision Metals regardless of the purchase orders. Plus, it is far from clear that unilateral termination rights defeat consideration under Michigan law. *Cf. Gen. Motors*, 644 N.W.2d at 738–39 (noting a residual duty to act in good faith even if contract might fail for lack of consideration).

We recognize that "Letters of Intent" do not always bind their signatories. In some instances, they "do no more than set the stage for negotiations on details." *Empro Mfg. Co., Inc. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 426 (7th Cir. 1989). But no reasonable jury could have understood Stackpole's Letter of Intent as a mere stage-setter. Precision Metals shipped parts under it for two years before trouble arose. The trial court did not err in entering summary judgment accordingly.

*Contract formation—Angstrom Automotive.* Because Angstrom Automotive signed the Letter of Intent, it too bore contractual duties to Stackpole. In Michigan, as elsewhere, contracts do not automatically bind a party's corporate siblings. *See, e.g.*, *Acton Plumbing & Heating Co. v. Jared Builders, Inc.*, 118 N.W.2d 956, 958 (Mich. 1962). But firms remain liable under contracts to which they are parties, an approach that is a significant step removed from automatically making related companies liable for others' responsibilities. *E.g.*, *Jeffrey v. Rapid Am. Corp.*, 529 N.W.2d 644, 651 (Mich. 1995). Under Michigan law, Angstrom Automotive was a party to the Letter of Intent if it gave and received consideration, a competent employee gave the company's assent, and the letter had a proper subject matter. *See AFT Mich.*, 866 N.W.2d at 804.

Angstrom Automotive, separate and apart from its relationship with Precision Metals, met this test. It bargained for payments and parts under the Letter of Intent, confirming that consideration supported the letter. Because an Angstrom Automotive officer signed the letter as an employee of "Angstrom Automotive Group," a party competent to contract gave assent. R.51-10 at 3. And no one questions the other prerequisites to contract formation.

Angstrom's efforts to sidestep this conclusion sputter.  It is true that Precision Metals, not Angstrom Automotive, undertook most of the letter's duties and many of its rights.  Precision Metals, for example, produced parts, accepted payment, awarded volume discounts, and received purchase orders.  But these realities do not mean that Angstrom Automotive did not give consideration.  Rights and duties can be "bargained for" even if they fall to an entity's subsidiary or affiliate.  *See, e.g.*, Restatement (Second) Contracts § 79 & cmt. b, illust. 1 (explaining that a benefit to a third party qualifies as consideration).  More to the point, these facts do not erase Angstrom Automotive's signature on the letter or obscure its oversight of essentially everything Precision Metals did.

Nor did Angstrom Automotive deal with Stackpole only as an agent for Precision Metals. Under Michigan law, agency requires that a principal control an agent's actions.  *E.g.*, *Little v. Howard Johnson Co.*, 455 N.W.2d 390, 393 (Mich. Ct. App. 1990).  Yet as a management company responsible for Precision Metals, Angstrom Automotive was if anything in the opposite position.  It had "full control over" Precision Metals.  R.61 at 15; *see id.* at 11–16.  Some Angstrom Automotive employees, it is true, described themselves as "agents" of Precision Metals.  *Id.* at 13–14.  But such unadorned legal conclusions in a deposition do not suffice to put Angstrom's agency argument to a jury.  *See, e.g.*, *Lemon v. Norfolk S. Ry. Co.*, 958 F.3d 417, 419–20 (6th Cir. 2020).

Angstrom Automotive claims that it never meant to join the contract.  But the test for mutuality is "objective," making Angstrom Automotive's subjective intentions irrelevant. *Goldman v. Century Ins. Co.*, 93 N.W.2d 240, 243 (Mich. 1958).  As a matter of law, Angstrom Automotive was a party to the contract, as the district court correctly held.

*Advanced product quality planning.*  While Stackpole did not engage in advanced product quality planning with Precision Metals, that failure did not eliminate Angstrom Automotive or Precision Metals' obligations under the Letter of Intent.  Contracts need not bind immediately.  When contracts contain "conditions precedent," they do not impose duties until the conditions take effect.  *See, e.g.*, *MacDonald v. Perry*, 70 N.W.2d 721, 725 (Mich. 1955). Michigan courts construe ambiguous contracts to avoid conditions precedent.  *See id.*

The Letter of Intent did not unambiguously create unfulfilled conditions precedent. Its text does not use conditional language, save a vague caveat never invoked during the first two years that "[o]ther conditions apply unless noted otherwise." R.51-10 at 2. Meanwhile, context strongly suggests that Precision Metals' performance obligations were not contingent on anything. Confirming the point, Precision Metals did not wait for any future event before starting production. Stackpole instead simply sent its purchase orders, and Precision Metals began shipping shafts—and did so for the next two years without objection and without any talk of pre-existing duties.

Angstrom says that the Letter of Intent made advanced product quality planning a condition precedent to its obligations to ship parts, noting that the Letter of Intent cross-references Precision Metals' original quotes, which in turn made "[a]cceptance of order subject to" advanced review. R.51-7 at 2; R.51-8 at 2; R.51-10 at 2. But this language is ambiguous. Does it mean that Precision Metals could *revoke* an order's acceptance until advanced review? Or does it authorize Precision Metals to *withhold* acceptance pending advanced review, such that Precision Metals' quotes were not binding offers? On the latter reading, when Precision Metals commenced performance under the Letter of Intent and did so for two continuous years, it "accepted" Stackpole's "order" notwithstanding any lack of advanced review. In this context, the letter does not create unambiguous conditions precedent as a matter of Michigan law.

*Reasonable notice.* The Letter of Intent required Angstrom Automotive and Precision Metals to supply Stackpole with parts until they offered reasonable notice of termination. As a result, Stackpole was entitled to partial summary judgment, leaving for the jury the fact question whether reasonable notice occurred. Precisions Metals and Angstrom Automotive's contrary arguments are mistaken.

Under Michigan law, a contract that "provides for successive performances but is indefinite in duration . . . may be terminated at any time." Mich. Comp. L. § 440.2309(2). Termination ordinarily requires "reasonable notification," but a contract can "dispens[e] with notification" unless doing so "would be unconscionable." *See id.* § 440.2309(3). The parties

agree that the Letter of Intent provided for successive performances, that it was indefinite in duration, and that dispensing with notification would not have been unconscionable. The only question is whether the letter in fact dispensed with notification of termination.

The language of the Letter of Intent says nothing about termination rights. It references Angstrom's initial quotes to Stackpole, but those quotes do not discuss termination either. Nor does the setting of the letter offer any such indication. No contextual factor, say industry custom or prior dealings between Stackpole and Angstrom, suggests that Angstrom and Stackpole retained the right to terminate the Letter of Intent without notice.

The reality that the supplemental purchase orders authorized Stackpole to terminate "at any time and for any reason," R.51-15 at 7; R.51-16 at 9, does not change things. The purchase orders never became effective because neither Angstrom Automotive nor Precision Metals signed them. Plus, construing the arrangement to grant *Stackpole* unlimited termination rights would not have vested parallel rights in Angstrom Automotive or Precision Metals.

*Sundram Fasteners, Ltd. v. Flexitech, Inc.*, No. 08-CV-13103, 2009 WL 3763772 (E.D. Mich. Nov. 9, 2009), does not advance the ball for Angstrom either. In that case, a "blanket purchase order" gave a buyer the right but not the obligation to purchase certain goods. *Id.* at *9. The district court held that the buyer could terminate the purchase order without notice because it had no obligation to buy anything under the agreement anyway. *Id.* Angstrom, in contrast, is not a buyer without an obligation to buy. It is a seller with an obligation to sell. That makes *Sundram Fasteners* doubly inapt.

The district court did not err in granting Stackpole partial summary judgment on its breach-of-contract claims against Precision Metals and Angstrom Automotive.

B.

*The counterclaim.* Precision Metals maintains that, even if it did breach its contract with Stackpole, Stackpole breached first by refusing to approve its preferred automatic process for the 10R/10L parts. We disagree.

Under Michigan law, actions for breach of contract require (1) a contract (2) that was breached and (3) damages. *See, e.g.*, *Miller-Davis Co. v. Ahrens Const., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014). The Letter of Intent, as shown, was a contract, and Stackpole does not argue that its refusal to approve automatic manufacturing left Precision Metals unharmed. That leaves only the question whether Precision Metals presented a jury question as to breach.

A party breaches a contract when it fails to perform a contractual duty it owes. *See, e.g.*, 23 Williston on Contracts § 63:1 (4th ed. 2022). Michigan courts ordinarily ascertain contractual duties based on a contract's text in context. *See, e.g.*, *Calhoun Cnty.*, 824 N.W.2d at 211–12. Michigan law says that "[e]very contract" for goods "imposes an obligation of good faith in its performance," Mich. Comp. L. § 440.1304, although this obligation will not trump a contract's express terms. *See, e.g.*, *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826–27 (6th Cir. 2003).

Based on the summary judgment record, no reasonable jury could have found that Stackpole breached its duties under the Letter of Intent. For starters, the letter's text required only that Precision Metals supply Stackpole with 10R/10L parts. It did not impose any process-approval duties on Stackpole. The letter did cross-reference Precision Metals' quotes, but the quotes did not refer to a manufacturing process.

Nor does context help Precision Metals. The parties agree that the automotive industry's standard procedure for manufacturing changes helps contextualize the Letter of Intent. *See* Mich. Comp. L. §§ 440.1303(3), (5). The parties agree, or at a minimum do not contest, that this procedure required Stackpole to approve automatic manufacturing of shafts only after Precision Metals produced a sample batch of automatically manufactured shafts for Stackpole's review. And the parties agree that Precision Metals never produced the requisite batch. In light of this industry context, Stackpole never owed Precision Metals approval duties because Precision Metals never offered it parts to approve.

Last but not least, Stackpole did not breach a duty of good faith or fair dealing when it refused to approve Precision Metals' automatic manufacturing process. The district court found "no evidence" that Stackpole had acted "maliciously [or] in bad faith . . . in declining" to

approve the automatic process, R.61 at 23, and Precision Metals does not challenge that conclusion here.

Precision Metals' contrary arguments do not persuade. It does not matter, to start, whether Precision Metals could have produced acceptable 10L/10R shafts through its automatic process. Having agreed to purchase shafts from Precision Metals, Stackpole sure enough was obliged to accept shafts that conformed to its contract. And it was obliged to avoid "anticipatory repudiation," meaning that it could not tell Precision Metals that it would refuse to accept conforming shafts in advance. Mich. Comp. L. § 440.2610(b); *see also Van Buren Charter Twp. v. Visteon Corp.*, 904 N.W.2d 192, 202 (Mich. Ct. App. 2017). But Precision Metals never shipped any such shafts, and Stackpole never anticipatorily repudiated anything. If Precision Metals thought its automatic process was adequate under the Letter of Intent, it could have shipped conforming shafts and sued if Stackpole rejected them. But that's not what Precision Metals did.

It does not matter whether Precision Metals originally planned to use an automatic rather than a manual manufacturing process in manufacturing shafts for Stackpole. Any such plans were unshared at the time that the Letter of Intent was signed and thus did not create contractual duties. *See Zurich Ins. Co. v. CCR & Co.*, 576 N.W.2d 392, 395 (Mich. Ct. App. 1997).

It does not matter that Precision Metals' 10R/10L shafts bore various commercial and technical similarities to its older T70 shafts, that Precision Metals' pricing and negotiations had tied the two shafts together, and that the T70 shafts had been produced through an automatic process. Even if all of this is true, Precision Metals' proposed conclusion—that Stackpole should have realized that it would have to approve automatic production—does not follow. These facts may have hinted that Angstrom planned to use an automatic process to produce the 10R/10L shafts, but no reasonable jury could have concluded that they put Stackpole on notice that it was *obliged* to offer advance acceptance of automatic production.

It does not matter that Stackpole offered only interim approval for Precision Metals' manual production process. That reality hurts rather than helps Precision Metals. Stackpole offered interim approval after reviewing a sample batch of manually produced parts. If anything,

that suggests Stackpole did *not* need to approve a new manufacturing method until it had reviewed a new sample batch.  Precision Metals never offered any sample parts for approval, and it was not entitled to demand such approval from Stackpole, much less after two years of production.

III.

Angstrom separately objects to three of the district court's decisions at trial, two involving the admission of evidence and one relating to jury instructions.  We review each decision for abuse of discretion.  *Cummins v. BIC USA, Inc.*, 727 F.3d 506, 510 (6th Cir. 2013) (evidence); *United States v. Ray*, 803 F.3d 244, 277 (6th Cir. 2015) (jury instructions).

*Evidence—threats.*  Angstrom says that the district court improperly allowed Stackpole to introduce its threats to stop shipping parts into evidence and to compare those threats to a "nuclear option" or a "hostage situation."  *See, e.g.*, R.101 at 14.  No abuse of discretion occurred.

Relevant evidence is presumptively admissible.  Fed. R. Evid. 402.  A court "may exclude relevant evidence," however, "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues . . . [or] wasting time."  *Id.* 403.  When parties ask district courts to balance these factors in the course of an up or down admissibility decision, we give their conclusions a wide berth.  *See United States v. Libbey-Tipton*, 948 F.3d 694, 704–05 (6th Cir. 2020).

Angstrom's threats were relevant and did not risk unfair prejudice.  A central issue at trial was whether Angstrom's threats amounted to reasonable notice of termination.  No jury could have answered that question without understanding what Angstrom had threatened and when.  The threats may have cast Angstrom in a bad light, but it does not follow that they were irrelevant or unfairly prejudicial.  *See id.*

Nor did Stackpole's "nuclear option" or "hostage situation" comparisons change things.  Those comparisons illustrated to the jury that losing access to shafts, even for a day, could have had devastating consequences for Stackpole.  That reality was relevant for a jury seeking to

define reasonable termination times.   The greater the risks associated with termination, the lengthier one might expect a pre-termination notice period to be.   *See generally* David Frisch, 2A *Anderson on the Uniform Commercial Code* §§ 2-309:45–50 (3d ed. 2021).   Nor were stock phrases like "nuclear option" or "hostage situation" likely to inflame or confuse the jury.

Angstrom pushes back, maintaining that it offered Stackpole notice of termination in April, such that its May and June threats to stop shipments were irrelevant and thus inadmissible. But the parties disputed at trial whether Angstrom's April communications amounted to notice of termination, and Angstrom does not argue on appeal that its April communications to Stackpole amounted to notice as a matter of law.   That made it sensible to let the jury see all of Angstrom's communications in deciding whether Angstrom ended the deal in April, May, or June.

Angstrom argues that its threats to stop shipment were particularly prejudicial because, at trial, Stackpole's counsel linked them to shortages prompted by COVID-19.   But COVID-related shortages presented natural analogies about the impact of supply-chain problems at that point in time.   There was nothing unduly prejudicial about them.

*Evidence—manufacturing methods.*   Angstrom argues that the district court incorrectly excluded evidence that Angstrom had lost money on Stackpole's parts and that it had tried, but failed, to manufacture Stackpole's parts using an automatic process.   Accept for the sake of argument that Angstrom's evidence could have been relevant in principle, as higher costs for Angstrom would have made an earlier termination period more reasonable.   But Angstrom did not intend to use its evidence for this purpose.   It sought to use the evidence to show that it had never breached its contract and that Precision Metals was "entitled" to a price increase.   R.102 at 207; *see id.* at 205.   Used in this manner, Angstrom's evidence would have wasted time and confused the jury, making exclusion a matter well within the trial court's discretion.

*Jury instructions.*   Angstrom objects that the district court instructed the jury that Precision Metals and Angstrom Automotive had contracted with Stackpole.   A district court, however, does not abuse its discretion by giving relevant and legally correct jury instructions. *See Nolan v. Memphis City Schs.*, 589 F.3d 257, 273 (6th Cir. 2009).   For the reasons already

shown, the instruction that Precision Metals, Angstrom Automotive, and Stackpole had all formed a contract for parts was relevant and legally correct.

We affirm.