**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0664n.06

**No. 10-5685**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

*Jun 22, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| MARK THOMPSON, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| QUORUM HEALTH RESOURCES, LLC, | ) | KENTUCKY |
| | ) | |
| Defendant-Appellant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TRIAD HOSPITALS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

Before: SUHRHEINRICH, GIBBONS, and McKEAGUE, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Mark Thompson brought a retaliatory discharge claim under the False Claims Act, 31 U.S.C. § 3730(h), after he was suspended and later discharged by his employer, Quorum Health Resources, LLC, ("Quorum") a healthcare company. A jury concluded that Thompson was fired in retaliation for filing a *qui tam* action against Quorum. Quorum now appeals the district court's denial of its motion for a new trial or, in the alternative, for judgment as a matter of law. For the reasons set forth below, we affirm.

**I.**

Quorum contracts with hospitals to provide management services. These services include providing the client hospital with key management staff, such as a CEO and CFO. Thompson was

hired by Quorum in 1994 to serve as CEO of Cumberland County Hospital in Burkesville, Kentucky. In 1999, Thompson was offered and accepted the CEO position at Monroe County Medical Center ("MCMC"), a Quorum-managed facility.

During Thompson's tenure as CEO of MCMC, the relationship between MCMC and Quorum was governed by a management agreement. Pursuant to the management agreement, Quorum was paid an annual fee for its consulting and management services. Quorum was also paid a percentage commission based on the amount of goods and services MCMC purchased from Group Purchasing Organizations, or GPOs—vendors of hospital goods—with which Quorum had a relationship.

Shortly after he began working at MCMC, Thompson began having concerns about the manner in which his supervisor, Taylor Cook, was representing certain aspects of the management agreement to MCMC's Board of Directors (the "Board"). Specifically, Thompson was concerned with Cook's representation to the Board that MCMC was switching GPOs, without disclosing to the Board that the decision regarding which GPO to use was one that the Board could make. Thompson was also concerned with Cook's failure to bring the 2000 management agreement to the Board as a whole—rather, Cook directed Thompson to just obtain the Board Chairman's signature on the contract. Thompson also believed that Cook had misrepresented to the Board that Quorum's management fee was calculated based on the consumer price index, rather than the medical consumer price index. Finally, Thompson believed that Cook failed to disclose to the Board that the 2002 management contract required Quorum's fee to increase by no less than 5% compounded annually.

As a Quorum employee, Thompson was bound by a Code of Conduct which required him to report any suspected violations of policy, procedure or law to Quorum. Each year he was employed by Quorum, Thompson certified his compliance with the Code of Conduct. On none of these Code of Conduct forms did Thompson indicate any concerns about Cook's misrepresentations and omissions to MCMC. On November 19, 2002, Thompson called Quorum's compliance hotline to report his concerns about Cook, but when he was asked to identify which hospital he worked for, he declined to provide the requested information and reported no concerns.

Thompson filed a *qui tam* suit pursuant to the False Claims Act on January 14, 2004. The complaint alleged that Quorum had defrauded the federal government by unnecessarily driving up MCMC's costs—which were in turn passed on to Medicare—by improperly selecting hospital vendors and GPOs. Assistant United States Attorney Bill Campbell, who investigated Thompson's *qui tam* allegations, advised Thompson not to disclose the existence of his *qui tam* lawsuit because it was under seal.

In 2004, MCMC's independent accounting firm, Taylor, Polson & Company ("Taylor Polson"), conducted an audit of MCMC. As part of the audit, Taylor Polson sent certain MCMC Board members and executives, including Thompson, an audit questionnaire which asked about the potential for fraud at MCMC. Thompson received the audit questionnaire in May of 2004 and returned it to Taylor Polson in August. Thompson responded to several questions about the potential for fraud at MCMC as follows:

> Question: "Do you believe Monroe County Medical Center has controls and systems in place to prevent a significant fraud from occurring in the Organization?"
>
> Response: "No—Management Contract."

Question: "Where do you believe the Organization is most vulnerable to significant fraud?"

Response: "Management Contract."

Question: "Do you have any reason to question the integrity of any of your financial personnel?"

Response: "Yes."

Question: "Do you have any suspicions of fraud that you believe we should consider?"

Response: "Yes."

John Taylor of Taylor Polson requested a meeting with Thompson to discuss his questionnaire responses. On August 20, 2004, Thompson and his attorney met with Taylor. Thompson told Taylor that the management contract was not "being handled appropriately" and certain changes in the contract were not "being divulged as [they] should have been." (DE 145, Trial Tr. Vol. II, at 227.) Thompson expressed concerns about the Board's approval of the management contract without having reviewed it and about the Board's being misled by Cook. Thompson also expressed concerns about MCMC's purchasing agreements with vendors.

On September 2, 2004, Taylor met with the Board's Finance Committee to discuss Thompson's responses to the audit questionnaire and his meeting with Thompson. The members of the Finance Committee expressed surprise at Thompson's concerns and directed Taylor to notify MCMC CFO Rickie Brown about Thompson's responses and to have Brown contact Cook. Cook then informed Joe Beck, Quorum's corporate compliance officer, of Thompson's responses to the questionnaire.

4

In October, Beck and Chris Kelly, Quorum's General Counsel, traveled to MCMC to meet with the Finance Committee and Thompson to discuss Thompson's fraud allegations. At the meeting, Thompson refused to answer questions about his concerns because his attorney was not present. Kelly then sent a letter to Thompson's attorney, dated November 1, 2004, which stated that Quorum and the Finance Committee had been trying to meet with Thompson to understand his fraud concerns, but Thompson had been unwilling to meet with Quorum or the committee outside of the presence of his attorney. Kelly demanded that Thompson meet with Quorum and the Finance Committee by November 5, 2004. By letter dated November 5, 2004, Thompson's attorney informed Kelly that Thompson would be in a better position to meet with Quorum and the Committee some time after November 18, 2004. On November 18, 2004, Beck sent a letter to Thompson informing him that he had violated the Code of Conduct by failing to report his fraud concerns to Quorum and by failing to cooperate in Quorum's investigation of those concerns. Beck informed Thompson that these Code violations subjected him to potential disciplinary action, including termination. Beck then demanded that Thompson meet with Quorum representatives on November 29 or 30, or December 1, 2004.

On November 29, 2004, Kelly received a letter from AUSA Campbell informing him that Thompson had filed a *qui tam* lawsuit pursuant to the False Claims Act. Campbell advised Quorum not to take any steps against Thompson that might constitute retaliation. The next day, a representative of the law firm Epstein Becker, outside counsel for Quorum, called Campbell to tell him that it would be investigating the matter on Quorum's behalf. About two weeks later, Epstein Becker wrote to Campbell requesting a copy of Thompson's False Claims Act complaint, and

informing Campbell that prior to the receipt of his letter, Quorum had determined that Thompson would likely be discharged for his "refusal to comply with his reporting and disclosure obligations under [Quorum's] compliance program." (Appellant's App'x, at 25.) The letter also informed Campbell that, in light of his November 29 letter, Quorum had decided to suspend Thompson temporarily with pay instead of terminating his employment immediately.

On December 27, 2004, Thompson was suspended with pay. Quorum informed Thompson that he was suspended, in part, for deliberately and continuously refusing to comply with Quorum's Code of Conduct and his resulting insubordination.

In February 2005, Thompson joined the National Guard and in July 2005, Thompson was deployed to Iraq. Thompson served in Iraq for about a year. After his return from Iraq, Quorum completed Thompson's employment termination—effective July 28, 2006—which it had begun in January 2005. Quorum informed Thompson that he was being terminated for violating the Code of Conduct by failing to report his fraud concerns to Quorum and by failing to cooperate with Quorum's subsequent investigation.

Thompson filed a retaliatory discharge lawsuit on October 25, 2006, alleging that Quorum terminated him in retaliation for his protected conduct of filing a False Claims Act suit, in violation of 31 U.S.C. § 3730(h). Prior to trial, the district court held that Thompson had engaged in protected conduct and that Quorum knew of this protected conduct at the time of Thompson's suspension and termination. *See Thompson v. Quorum Health Resources, LLC*, No. 1:06-CV-168, 2009 WL 4758752, at *6 (W.D. Ky. Dec. 7, 2009). The court therefore concluded that Thompson met the first two prongs of a retaliatory discharge claim. *Id.*

Before trial, Thompson moved *in limine* to exclude evidence of the government's decision not to intervene in his *qui tam* suit, arguing that the government's decision was irrelevant to the merits of his retaliatory discharge claim. *See Thompson v. Quorum Health Resources, LLC*, No. 1:06-CV-168, 2010 WL 234801, at *3–4 (W.D. Ky. Jan. 13, 2010). Quorum argued that the government's decision not to intervene was relevant to refute Thompson's allegations that Quorum did not cooperate with the government's investigation, and because Thompson alleged that Quorum terminated him in order to prevent him from cooperating with the government. *Id.* at *4. The district court held that the outcome of the underlying *qui tam* case, and the government's decision not to intervene in that case, was irrelevant to whether Quorum retaliated against Thompson. *Id.* The court reasoned "that the government's decision not to intervene may have been based on a variety of factors, so it [was] not necessarily probative . . . Further, the evidence [was] likely to mislead or confuse the jury." *Id.* The court concluded "that the prejudicial effect of introducing the government's decision not to intervene outweigh[ed] any probative value." *Id.*

Thompson's case was tried to a jury over five days. During the pretrial conference, Quorum argued that the details of Thompson's *qui tam* allegations were irrelevant to his retaliation case in light of Quorum's stipulation that Thompson had engaged in protected activity. Thompson argued that the specifics of his *qui tam* allegations were relevant to show that Quorum retaliated against him in an attempt to cover up the fraud occurring at the company. Thompson also argued that the presence of fraud at the company and Quorum's failure to investigate that fraud were relevant to whether Quorum's stated reason for firing Thompson was pretextual, because evidence of fraud and failure to investigate it showed that Quorum was selectively enforcing its Code of Conduct against

7

Thompson while ignoring other Code violations. The court agreed that, to the extent that Quorum knew of and covered up or failed to investigate fraud or compliance violations at Quorum, this evidence was relevant to the pretext issue. The court also ruled, however, that it would allow Quorum to introduce evidence during trial that Thompson dismissed his *qui tam* case.

At trial, Thompson elicited testimony from Taylor Cook, his former supervisor, about Thompson's fraud allegations related to the management agreement. Thompson then called AUSA Campbell and elicited testimony about Thompson's meetings with Campbell, Campbell's November 29, 2004 letter to Quorum informing it that Thompson had filed a False Claims Act suit, and Campbell's instruction to Thompson not to reveal the fact that he had filed the suit. After Campbell's direct examination concluded, Quorum's counsel argued that Campbell's testimony had opened the door to introduction of evidence that the government had declined to intervene in Thompson's *qui tam* suit. The district court ruled that Quorum could not elicit testimony about the government's decision not to intervene in the suit. It reasoned that the government's reasons for not intervening were often complex, rendering evidence of that decision of minimal relevance to Thompson's retaliation claim. The court also declined to let Quorum introduce evidence that Thompson voluntarily dismissed the *qui tam* case, reversing its pretrial ruling. Quorum moved for a mistrial, which the court denied. Instead, the court instructed the jury that the outcome of the government's investigation of Quorum and the outcome of the *qui tam* suit were not relevant to Thompson's retaliation suit. Thompson then testified about the suspicions of fraud that led him to file a False Claims Act lawsuit against Quorum.

Quorum General Counsel Chris Kelly also testified. Kelly conceded that prior to receiving Campbell's letter informing Quorum of Thompson's *qui tam* lawsuit, Quorum had not made a definitive decision to fire Thompson. Kelly also testified that Quorum had not yet received a copy of Thompson's *qui tam* complaint when Epstein Becker conducted its investigation or when Thompson was suspended. Kelly testified that the government assessed no fines or penalties against Quorum as a result of Thompson's fraud allegations. Quorum also elicited testimony from MCMC CFO Ricky Brown. Brown testified about the nature of Thompson's fraud allegations and further opined that the Board was adequately informed of changes to the management agreement. Vicky McFall, MCMC's CEO at the time of trial, also testified that MCMC continued to engage Quorum for management services and continued to use the same GPO used during Thompson's tenure as CEO after Thompson was fired.

On February 5, 2010, the jury found that Quorum violated 31 U.S.C. § 3730(h) when it discharged Thompson, and awarded him $400,644.00 in back pay, $70,000 in front pay and $30,000 for pain and suffering. The district court entered judgment against Quorum, doubling the jury's back pay award pursuant to 31 U.S.C. § 3730(h), for a total damages award of $901,288.00. Quorum moved for judgment as a matter of law, or, in the alternative, for a new trial. The district court denied Quorum's motion. Quorum now appeals.

**II.**

On appeal, Quorum first argues that it is entitled to a new trial because the district court permitted Thompson to testify at length about the fraud allegations that underlay his *qui tam* complaint but prohibited Quorum from introducing evidence that the government declined to

9

intervene and that Thompson dismissed his *qui tam* complaint with prejudice. Upon review, we conclude that the district court did not err in denying Quorum's motion for a new trial.

We review the district court's denial of a motion for a new trial for an abuse of discretion. *See Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 528 (6th Cir. 2005). Reversal is appropriate only if we have "a definite and firm conviction that the trial court committed a clear error of judgment." *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 820 (6th Cir. 2000) (internal quotation marks omitted). A motion for a new trial should be granted "only when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Mitchell v. Boelcke*, 440 F.3d 300, 303 (6th Cir. 2006) (internal quotation marks omitted).

We review a district court's evidentiary rulings—including its decision to admit or exclude evidence pursuant to Federal Rule of Evidence 403—for an abuse of discretion. *Nolan v. Memphis City Sch.*, 589 F.3d 257, 264 (6th Cir. 2009); *Paschal v. Flagstar Bank*, 295 F.3d 565, 576 (6th Cir. 2002). "Even if a district court's evidentiary ruling is erroneous, a new trial is not warranted if the abuse of discretion constituted harmless error." *Nolan*, 589 F.3d at 264–65.

Quorum argues that evidence of Thompson's fraud allegations was irrelevant to whether Quorum's stated reason for discharging him was pretextual. It further argues that even if such evidence had probative value, its value was substantially outweighed by the danger of unfair prejudice, confusion of the issues and misleading the jury.

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." F. R. Evid. 401. Thompson's theory at trial was that Quorum knew that Cook was defrauding MCMC but was willfully blind to Cook's fraud so that it would not have to report it to the government through a self-compliance reporting program. Thompson argued that, in order to show that Quorum's stated reason for firing him was pretextual, he needed to show that Quorum conducted a sham investigation into his allegations—thereby demonstrating that Quorum was not truly committed to enforcing its Code of Conduct.

The district court did not err in allowing Thompson to introduce evidence relating to his allegations that Cook was defrauding MCMC by misleading its Board. In order to show that Quorum did not actually fire him for violating the Code of Conduct, Thompson adduced evidence that, after he submitted his audit responses to Taylor Polson, Quorum conducted a relatively minimal investigation into his fraud allegations. In order to pursue his theory that Quorum was not truly seeking to uncover and correct compliance issues and that his firing for failing to comply with the Code of Conduct was therefore implausible, Thompson needed to demonstrate that fraud was occurring at Quorum and that the company failed to conduct an investigation sufficiently thorough to reveal it.

A more significant question exists as to whether the district court erred in allowing Thompson's testimony regarding Cook's alleged fraud to exceed that which was necessary to pursue his theory of the case. Thompson testified extensively about the complexities of the management agreement between Quorum and MCMC and the various ways in which he believed Cook's conduct

defrauded the hospital. The introduction of this evidence did not prejudice Quorum, however, because Quorum was given the opportunity to—and did—adduce substantial evidence to refute Thompson's fraud allegations. Quorum called CFO Ricky Brown, who testified to the complexities of the management agreement, and opined that Quorum did not, through Cook, defraud MCMC. Quorum also called Vicky McFall, who testified that MCMC still employed Quorum to provide hospital management services and that MCMC still used the GPO to which it switched during Thompson's tenure as CEO. Quorum was thus able to introduce evidence tending to refute Thompson's testimony that MCMC was tricked into switching to an unfavorable GPO through Cook's malfeasance. Finally, and perhaps most importantly, Quorum General Counsel Kelly testified that Quorum was not assessed any fines or penalties by the government as a result of Thompson's fraud allegations. Thus, Quorum was able to counter Thompson's testimony that Cook was defrauding MCMC. Moreover, the district court instructed the jury that the outcome of the government's investigation of Quorum was not relevant to the merits of Thompson's case, limiting the potential prejudicial effect Thompson's testimony about his fraud allegations could have had on the jury. *See Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir. 2006) (trial court's giving of limiting instructions may cure prejudice.)

Turning to the government's decision not to intervene in Thompson's *qui tam* case and Thompson's subsequent dismissal of the suit with prejudice, the district court did not err in excluding this evidence. The government did not decline to intervene in Thompson's suit until years after his termination, undermining any relevance this evidence might have had to the merits of Thompson's retaliatory discharge claim. Moreover, the district court correctly noted that the "the

government's decision not to intervene does not necessarily indicate that . . . the [*qui tam*] case had no merit.  The government may choose not to intervene for a variety of reasons.  Likewise, a plaintiff may dismiss a case voluntarily for any number of reasons—cost, time, etc." (DE 162, Mem. Op., at 8.)

Even if the government's non-intervention and Thompson's dismissal of the *qui tam* action were of some limited relevance, Quorum was not prejudiced by the exclusion of this evidence. Through Kelly, Quorum introduced evidence that it was neither fined nor assessed penalties as a result of the government's investigation into Thompson's *qui tam* allegations.  Quorum was therefore able to undermine Thompson's claim that Quorum had defrauded MCMC, and the district court properly denied Quorum's motion for a new trial.

### III.

Quorum next argues that it is entitled to judgment as a matter of law because Thompson failed to present sufficient evidence to prove that Quorum's proffered reason for terminating his employment was pretextual.  After reviewing the record, we conclude that the district court did not err in denying Quorum's motion for judgment as a matter of law.

We review a district court's denial of a motion for judgment as a matter of law *de novo*. *Noble v. Brinker Int'l, Inc.,* 391 F.3d 715, 720 (6th Cir. 2004).  Judgment as a matter of law is appropriate only when "viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Id.* (internal quotations marks omitted.)  In other words, judgment as a matter of law should be rendered only when "there is no legally sufficient evidentiary

basis for a reasonable jury to find for [the non-moving] party" on a material issue. *Id.* at 722

(internal quotation marks omitted). "Credibility determinations, the weighing of the evidence, and

the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*

*v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal quotation marks omitted).

Quorum argues that Thompson did not offer sufficient evidence from which a reasonable

jury could infer that Quorum's proffered reason for firing him was pretextual.[1] "A plaintiff will

usually demonstrate pretext by showing that the employer's stated reason for the adverse

employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient

to explain the employer's action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir.

2008). "However, the plaintiff may also demonstrate pretext by offering evidence which challenges

the reasonableness of the employer's decision to the extent that such an inquiry sheds light on

whether the employer's proffered reason for the employment action was its actual motivation." *Id.*

(internal quotation marks omitted).

At trial, Quorum argued that it had discharged Thompson because he violated the Code of

Conduct by failing to report compliance issues and by failing to cooperate with Quorum's

---

[1]To make out a claim for retaliatory discharge under the False Claims Act, a plaintiff "must show: (1) he engaged in a protected activity; (2) his employer knew that he engaged in the protected activity; and (3) his employer discharged or otherwise discriminated against the employee as a result of the protected activity." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003). Prior to trial, the district court ruled that Thompson had met the first two prongs of this test, and material issues of fact precluded summary judgment as to the third prong. *Thompson*, 2009 WL 4758752, at *6–7. With respect to the third prong, the court found that Quorum had proffered a legitimate, non-discriminatory reason for suspending and later terminating Thompson—his violation of the Code of Conduct—and therefore the only issue remaining for trial was whether Thompson could present evidence demonstrating that Quorum's legitimate, non-discriminatory reason for taking adverse employment action against Thompson was pretextual. *Id.* at *7.

investigation into his fraud allegations. However, Thompson presented evidence from which the jury could have inferred that this was not the actual reason for Thompson's termination. His proof included evidence that Quorum knew that Thompson had violated the Code of Conduct by failing to report compliance concerns as early as August 2004, when Thompson revealed his suspicions of fraud to John Taylor, MCMC's auditor. But Quorum did not terminate Thompson for violating the Code of Conduct in August 2004. Rather, from September through November 2004, Quorum threatened adverse employment action against Thompson, but took none. Even though Thompson continued to rebuff Quorum's requests that he elaborate on his fraud concerns and assist in the investigation, Quorum kept giving him additional chances to do so. Quorum demonstrated a willingness to meet with Thompson to discuss his fraud concerns and to allow him additional chances to cooperate with its investigation, until it was informed that he had filed a *qui tam* suit, in late November of 2004. The jury permissibly could have inferred that if Thompson's violations of the Code of Conduct were the legitimate non-discriminatory reason for Thompson's termination, Quorum would have terminated him soon after it learned that he had violated the Code of Conduct, in August 2004, or after he declined to cooperate with the investigation in September through November of 2004. The fact that Quorum did *not* terminate Thompson soon after it learned of his violations of the Code of Conduct gave rise to an inference of pretext.

We have held that

[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse

employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

In *DiCarlo v. Potter*, 358 F.3d 408, 421–22 (6th Cir. 2004), we held that the passage of only twenty-one days between an employee's protected conduct and his termination constituted indirect evidence of a causal connection sufficient to create an inference of retaliatory motive. *See also Shefferly v. Health Alliance Plan of Mich.*, 94 F. App'x 275, 285 (6th Cir. 2004) (passage of less than three weeks between employer's receipt of notice of plaintiff's EEOC charge and her termination gave rise to inference of discrimination).

Quorum suspended Thompson roughly one month after learning from Campbell's November 29, 2004 letter that Thompson had filed a False Claims Act suit. Such temporal proximity between when Quorum became aware of Thompson's protected conduct and when he suffered an adverse employment action gives rise to an inference of retaliatory motive.[2]

---

[2]Quorum argues that Thompson's suspension was not an adverse employment action because he was suspended with pay. We have held that an employee does not suffer an adverse employment action when she is placed on paid administrative leave pending the completion of a timely internal investigation. *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) ("[A] suspension with pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action." (quoting *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 803 (6th Cir. 2004) (internal quotation marks omitted) (emphasis omitted) (*en banc*), *abrogated on other grounds by Burlington N.A. Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006))).

However, this case is unlike *Peltier*. Thompson was not suspended pending an internal investigation into his alleged wrongdoing; rather, he was suspended *after* Epstein Becker had conducted its investigation, between November 29 and December 15, 2008. (Appellant's App'x, at 25.) Further, Thompson was not suspended to allow Quorum to investigate his alleged Code violations, but rather was suspended to assuage Campbell, who had told Quorum to not retaliate against Thompson. (*Id.* at 26.) Epstein Becker explicitly stated that Quorum had already determined that Thompson would likely be terminated at the time of his suspension but delayed the

Further, Thompson established that Quorum did not yet have Thompson's *qui tam* complaint at the time of Epstein Becker's investigation or his suspension. Thompson argued that without his *qui tam* complaint, Quorum could not have conducted a sufficient investigation to determine whether his fraud allegations were meritorious. Thompson argued that Epstein Becker's investigation was therefore a sham investigation which Quorum used to buttress its decision to suspend and terminate Thompson—and to obscure its retaliatory motive for his termination. According to Thompson's theory of the case, Quorum's sham investigation showed that the company was not truly concerned with compliance with its Code of Conduct; if it had been, it would not have completed its investigation until it had the *qui tam* complaint and would have conducted a thorough investigation. The "sham investigation" called into question Quorum's claim that it terminated Thompson for failing to comply with the Code of Conduct. The jury permissibly could have inferred that Quorum conducted a sham investigation into Thompson's fraud allegations, that this showed that Quorum was not committed to correcting compliance issues, and that it was therefore unlikely that Thompson was actually fired because he had violated the Code of Conduct. Finally, Quorum was unable to articulate any event that occurred between Thompson's suspension and his termination that ultimately caused Quorum to terminate Thompson. The temporal proximity between the receipt of Campbell's letter and Thompson's suspension, Quorum's arguably sham

---

terminating him in deference to Campbell. No internal investigation of Thompson's Code violations was conducted after he was suspended and Quorum began to process his termination soon thereafter. Therefore, Thompson's suspension preceding termination was essentially a *de facto* termination. Finally, Thompson was never reinstated after his suspension. *Peltier* is inapplicable where, as here, an employee is suspended for a purpose other than to allow his employer to conduct a timely internal investigation into his alleged wrongdoing.

investigation, and Quorum's inability to articulate what prompted it to move from suspension to termination supported the jury's inference of retaliatory motive. Accordingly, on these facts, the jury was entitled to infer that Quorum fired Thompson in retaliation for his filing a *qui tam* complaint against it.

Quorum points to Epstein Becker's December 15, 2004 letter as evidence that it had decided to terminate Thompson before it learned that he had filed a *qui tam* suit. This letter stated that, before it knew that Thompson had filed a *qui tam* suit, Quorum had already concluded that Thompson would likely be discharged based on his failure to comply with the reporting and disclosure obligations imposed by the Code of Conduct. However, Kelly testified that Quorum had not made a definitive decision to fire Thompson prior to the receipt of Campbell's letter. On this evidence, the jury was entitled to view this letter as a self-serving attempt by Quorum to insulate itself from a retaliation claim.

In sum, after reviewing the record, we cannot say that there was no legally sufficient evidentiary basis upon which the jury reasonably could have found that Quorum's proffered reason for terminating Thompson was pretextual.

Quorum claims that denying it judgment as a matter of law will immunize employees from the adverse consequences of failing to comply with their employers' codes of conduct because employers will not be able to discipline those employees who violate their company's code of conduct without fear of facing a retaliatory discharge lawsuit. We do not agree. Quorum was entitled to terminate Thompson for violating its Code of Conduct. But the jury found that Quorum did *not* terminate Thompson for this reason but rather terminated him in retaliation for his filing a

False Claims Act suit. The jury was entitled to reject Quorum's proffered reason for firing Thompson as pretextual, and we see no adverse consequences that will flow from such a determination.

## IV.

For the foregoing reasons, we affirm the judgment of the district court.