RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0169p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

JOURNEY ACQUISITION-II, L.P.,

*Plaintiff-Appellee,*

*v.*

No. 15-5966

EQT PRODUCTION COMPANY,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 6:12-cv-00108—Gregory F. Van Tatenhove, District Judge.

Argued: June 8, 2016

Decided and Filed: July 21, 2016

Before: BOGGS, CLAY, and GILMAN, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Pierre H. Bergeron, SQUIRE PATTON BOGGS (US) LLP, Cincinnati, Ohio, for Appellant. Elizabeth S. Kerr, FRIEDMAN, SUDER & COOKE, P.C., Fort Worth, Texas, for Appellee. **ON BRIEF:** Pierre H. Bergeron, Lauren S. Kuley, SQUIRE PATTON BOGGS (US) LLP, Cincinnati, Ohio, J. Kevin West, STEPTOE & JOHNSON PLLC, Columbus, Ohio, for Appellant. Elizabeth S. Kerr, Walker C. Friedman, FRIEDMAN, SUDER & COOKE, P.C., Fort Worth, Texas, Wayne C. Collier, KINKEAD & STILZ, PLLC, Lexington, Kentucky, Matthew C. Blickensderfer, FROST BROWN TODD, Cincinnati, Ohio, for Appellee.

———————————

## OPINION

———————————

RONALD LEE GILMAN, Circuit Judge. In late 2001, EQT Production Company sold or leased to Journey Acquisition-II, L.P. an array of oil- and natural-gas-producing properties in

1

Kentucky. Both parties thereafter continued to conduct oil and natural-gas operations in the state, but Journey later concluded that EQT was operating on some of the lands that—under the terms of the parties' 2001 contract—had actually been conveyed to Journey. This caused Journey to file suit against EQT in federal district court. Among other relief, Journey sought a declaration that it owned or controlled the properties in question and that EQT was liable to Journey for the oil and natural gas that EQT had removed from those properties.

The district court concluded on summary judgment that the parties' 2001 contract had unambiguously conveyed the disputed properties to Journey. It then presided over a one-week jury trial, with the jury finding that EQT's trespasses on Journey's lands were not in good faith. The court subsequently entered a final judgment that required EQT to pay $14,288,432 in damages and transfer certain oil and natural-gas wells to Journey.

EQT now appeals. It argues that the district court erred before trial (when construing the parties' contract), during trial (when excluding portions of EQT's proffered evidence), and after trial (when crafting the remedy for EQT's trespasses). Because we conclude that none of EQT's arguments has merit, we AFFIRM the judgment of the district court.

## I. BACKGROUND

### A. The parties and the initial transaction

Both EQT and Journey produce and sell oil and natural gas. As of 2001, EQT had property interests in several thousand acres of land located in Kentucky. These interests included properties owned outright, properties leased from third parties, and various pieces of machinery and equipment, such as wells and pipelines.

In 2001, EQT decided to sell many but not all of its property interests in Kentucky. To that end, EQT vice presidents Joseph Morris and Lester Zitkus prepared several maps that outlined in blue ink some or all of the properties that EQT intended to sell (the distinction between "some" or "all" being a key dispute between the parties). These maps were later included as exhibits to the final agreement between EQT and Journey.

Journey was ultimately the successful bidder for EQT's offering, and the two companies thereafter entered into a transaction in which Journey agreed to pay $64,090,000 for various property interests located throughout Kentucky. The contract memorializing this transaction (hereinafter referred to as the 2001 Agreement) consists of three separate documents: (1) an "Agreement of Sale and Purchase" (the PSA), (2) an "Oil and Gas Lease" (the 2001 Lease), and (3) an "Assignment, Bill of Sale and Conveyance" (the Master Assignment).

The PSA was executed on October 4, 2001. EQT agreed at that time that it would sell to Journey its interests in some of its Kentucky properties, as well as associated pipelines and oil or natural-gas wells. The PSA incorporates as "Exhibit A" a list of several hundred property interests that were to be included in the transaction. Each entry on the list states the name, acreage, and other information about the individual interest. Also attached to the PSA is "Exhibit N." This exhibit includes "a map of each field" for the purposes of the PSA's "Further Assurances" clause. It consists of the maps that Morris and Zitkus drew during EQT's preparation of its offering. The exhibit thus identifies at least the bulk of the properties to be transferred to Journey by outlining them in blue ink.

Exhibit A and Exhibit N are not coextensive. In particular, Exhibit A includes numerous property interests that are located outside of Exhibit N's blue lines. Exhibit A thus indicates that EQT transferred a greater amount of property to Journey than does Exhibit N.

Journey and EQT signed the 2001 Lease on November 30, 2001. This portion of the 2001 Agreement provides that EQT would lease certain properties to Journey for at least five years. Attached to the Lease is another "Exhibit A," which contains a list of the individual interests to be leased to Journey. In addition, the 2001 Lease includes "Exhibit A-1," which contains several maps of the lands involved in the transaction. These maps are identical or nearly identical to the maps included as Exhibit N to the PSA. As with Exhibit A and Exhibit N to the PSA, Exhibit A and Exhibit A-1 to the 2001 Lease are not coextensive. Instead, Exhibit A includes numerous properties that lie outside of Exhibit A-1's blue lines. Exhibit A thus indicates that EQT transferred a greater amount of property to Journey than does Exhibit A-1.

EQT and Journey signed the Master Assignment at the same time as the 2001 Lease.  The Master Assignment grants to Journey subleases in certain lands that EQT had already leased from third parties.  Included with the Master Assignment is a third "Exhibit A," which describes the various interests to be assigned to Journey.

**B.      The alleged trespasses**

After executing the 2001 Agreement, both EQT and Journey conducted their respective oil and natural-gas operations in Kentucky.  EQT interpreted the Agreement as transferring to Journey only those interests that had been depicted as lying inside the blue lines on the Exhibits N and A-1 maps.  It thus refrained from operating in areas within the blue lines, but continued to operate in areas located outside of those lines.  EQT contends that Journey also acted in conformity with this understanding of the Agreement, evidenced by the fact that Journey operated for eight years only in areas located inside the blue lines on Exhibits N and A-1.  Journey acknowledges that it initially operated inside the blue lines, but states that it did so not out of any understanding that the blue lines limited the extent of the Agreement, but simply because of practical necessities related to the location of the existing drilling infrastructure.

In 2009, Journey began reexamining its property interests in Kentucky.  This was a lengthy process that occurred over the course of several years.  During this time, Journey concluded that the 2001 Agreement covered all the interests described on the three Exhibits A, regardless of whether those interests appeared within the blue lines on the Exhibits N and A-1 maps.  Journey then realized that EQT had been drilling and operating certain wells (now known as the "Trespass Wells") in some of the areas purportedly conveyed to Journey, with the necessary implication that EQT had been trespassing on Journey's properties.

In 2011, Journey contacted EQT about the alleged trespasses.  The parties exchanged correspondence and attempted to amicably resolve the dispute, but these efforts were unsuccessful.  As a result, Journey finally filed suit against EQT in 2012 in the United States District Court for the Eastern District of Kentucky.

**C.     The proceedings below**

Journey's lawsuit sought a declaratory judgment establishing that the 2001 Agreement transferred to Journey all property interests described on the three Exhibits A. In addition, Journey alleged that EQT had trespassed on Journey's lands by drilling and operating the Trespass Wells. Journey added that EQT's trespasses were done "willfully" or in "bad-faith" because they had been done "with knowledge that it was wrong." As recompense, Journey demanded an accounting of the profits that EQT had allegedly derived by extracting oil and natural gas from Journey's properties.

EQT responded with various defenses, including laches, waiver, and estoppel. It also argued that the 2001 Agreement should be reformed on the basis of mutual mistake because both parties had ostensibly intended that the Agreement would cover only the lands within the blue lines of Exhibits N and A-1.

Both EQT and Journey eventually moved for summary judgment or partial summary judgment on their various claims and defenses. The district court largely ruled in Journey's favor. In doing so, the court first concluded that the 2001 Agreement unambiguously conveyed to Journey those properties listed on the three Exhibits A, and that the 2001 Agreement is not limited to the properties depicted within the blue lines on EQT's maps. This interpretation led the court to conclude that EQT had in fact trespassed on Journey's lands by drilling and operating the Trespass Wells.

The district court then concluded that genuine disputes of material fact precluded summary judgment on two key issues. These two issues resulted in a jury trial to determine (1) whether EQT's equitable defenses of laches, waiver, and estoppel were valid; and (2) whether EQT's trespasses had been committed in good faith. The jury acted in an advisory capacity on the first issue, *see* Fed. R. Civ. P. 39(c) ("In an action not triable of right by a jury, the court . . . may try any issue with an advisory jury . . . ."), and it rejected each of EQT's equitable defenses. On the second issue, the jury acted in a binding capacity and found that EQT's trespasses had not been committed in good faith. The district court later interpreted the

jury's verdict as establishing that EQT had "committed bad-faith trespass" or had trespassed "willfully."

During the trial, EQT sought to introduce testimony establishing that, at the time that it entered into the 2001 Agreement, it intended to sell only the properties located within the blue lines on Exhibits N and A-1. The district court largely forbade the presentation of this testimony. It noted its previous determination that the 2001 Agreement is unambiguous, and concluded that, as a matter of Kentucky law, such a written instrument must be interpreted solely by the court (rather than by the jury) and solely based on the terms of the Agreement itself (rather than with respect to extrinsic evidence). *See Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003) ("[I]n the absence of ambiguity[,] a written instrument will be enforced strictly according to its terms, and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." (footnotes and internal quotation marks omitted)).

The district court accordingly concluded that allowing EQT to introduce extrinsic evidence of its intent at the time of the 2001 negotiations would have invited the jury to inappropriately reinterpret the court's prior construction of the Agreement. In addition, the court explained that, under Rule 403 of the Federal Rules of Evidence, the danger of this inappropriate reinterpretation substantially outweighed whatever relevance EQT's proposed testimony might have.

After the trial, the district court entered a final judgment awarding $14,288,432 to Journey. This amount included both (1) compensation for EQT's unlawful extraction of oil and natural gas from Journey's properties, and (2) prejudgment interest of $4,988,133. The district court also ordered that EQT's interests in the Trespass Wells be transferred from EQT to Journey.

EQT now appeals. It maintains that the district court erred by (1) concluding that the 2001 Agreement is unambiguous, (2) precluding EQT from introducing evidence of what properties it intended to convey at the time of the negotiations in 2001, and (3) crafting a remedy that included the award of prejudgment interest and the transfer of the Trespass Wells to Journey.

## II. ANALYSIS

**A.      The district court correctly concluded that the Agreement between EQT and Journey is not ambiguous**

EQT first argues that the district court improperly concluded that the 2001 Agreement unambiguously conveys to Journey all the properties listed on Exhibits A to the PSA, the 2001 Lease, and the Master Assignment.  Reviewing the district court's interpretation and order de novo, *see Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.*, 409 F.3d 342, 346 (6th Cir. 2005), we reject this argument.

### 1.      *Choice of law and contract interpretation*

The district court had jurisdiction over this controversy based upon the parties' diversity of citizenship, so we apply the substantive law of the state in which the district court sits—in this case, Kentucky.  *See Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009).  Contractual interpretation in Kentucky "is solely a matter of law for the courts." *Jacob v. Dripchak*, 331 S.W.3d 278, 284 (Ky. Ct. App. 2011).   Our goal is to interpret the 2001 Agreement in a manner that effectuates the intent of the parties.  *See 3D Enters. Contracting Corp. v. Louisville & Jefferson Cty. Metro. Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005).

The process of interpretation begins by assessing whether the 2001 Agreement is ambiguous.  *See Frear*, 103 S.W.3d at 105-06.  If the Agreement is deemed ambiguous, then we may resolve the ambiguity by using extrinsic evidence, such as "the situation of the parties and the conditions under which the contract was written." *See id.* (citation omitted).  In contrast, we must interpret a contract that is not ambiguous "by assigning language its ordinary meaning and without resort to extrinsic evidence." *Id.*; *see also Cadleway Props., Inc. v. Bayview Loan Servicing, LLC*, 338 S.W.3d 280, 286 (Ky. Ct. App. 2010) ("An unambiguous written contract must be strictly enforced according to the plain meaning of its express terms . . . .").

A contract is ambiguous "when its language is reasonably susceptible of different constructions." *Blevins v. Riedling*, 158 S.W.2d 646, 648 (Ky. 1942); *Cadleway*, 338 S.W.3d at 286 ("[I]f the provisions in controversy are reasonably susceptible to different or inconsistent,

yet reasonable, interpretations, the contract is deemed to be ambiguous."). But not every inconsistency or disagreement renders a contract ambiguous. *See True v. Raines*, 99 S.W.3d 439, 443 (Ky. 2003), *as amended* (Apr. 2, 2003) ("[T]he mere fact that a party attempts to muddy the water and create some question of interpretation does not necessarily create an ambiguity[.]" (internal quotation marks and some alterations omitted)). Thus, "[o]nly actual ambiguities, not fanciful ones," affect the interpretation of a contract. *Id.*

### 2. The plain text of the 2001 Agreement is unambiguous

EQT contends that the 2001 Agreement is ambiguous because conflicts exist between (1) the lists of properties on the three Exhibits A, and (2) the blue-outlined properties on the maps on Exhibit N and Exhibit A-1. These conflicts purportedly create uncertainty about which properties were actually conveyed, with the result that the district court should have used extrinsic evidence—such as the proffered testimony from Morris and Zitkus—to assess the meaning of the Agreement.

We evaluate this argument by looking to the language of the 2001 Agreement itself. *See Frear*, 103 S.W.3d at 105-06. The first document that the parties executed was the PSA, which defines three categories of property. These include (1) the "Leasehold Interest," which consists of EQT's "right, title and interest in and to the oil, gas and/or mineral leases . . . described on **Exhibit A** attached hereto and made a part hereof" (emphasis in original); (2) the "Wells," which are EQT's interests in oil and natural-gas wells on the Leasehold Interest; and (3) the "Pipelines," which consist of EQT's interests in pipelines connected to the Wells. The PSA refers to these interests collectively as the "Oil and Gas Properties" or the "Properties." It also states that EQT "agrees to sell" the Properties to Journey and that, at closing, EQT "shall execute, acknowledge and deliver to [Journey] an assignment of the Properties."

These provisions establish that the 2001 Agreement transferred to Journey the assets listed on Exhibit A to the PSA. The "Properties," in other words, were to be sold and "deliver[ed] to [Journey]," and the "Properties" include, among other assets, the "Leasehold Interest." In turn, the "Leasehold Interest" includes "the . . . interests described on **Exhibit A**."

The PSA thus plainly contemplates that all properties listed on Exhibit A were to be transferred to Journey.

EQT asserts that the proper analysis is not so simple. It points to the PSA's "Further Assurances" clause, which states as follows:

> **Further Assurances.** After the Closing, Seller and Buyer shall execute and deliver, and shall otherwise cause to be executed and delivered, from time to time, such further instruments, notices, division orders, transfer orders and other documents, and do such other and further acts and things, as may be reasonably necessary to more fully and effectively grant, convey and assign the Properties to Buyer and to otherwise carry out the transaction contemplated hereby. Without limiting the foregoing, if after Closing it is determined that Seller owns other oil and gas interests or fee mineral interests within the geographic areas outlined in blue on the map attached hereto as **Exhibit N** which were omitted from the Assignment or [the 2001 Lease] contemplated hereunder, Seller shall convey such interests to Buyer for no additional consideration, and the parties will otherwise proceed to take such actions with respect to such interests as would have occurred if such interests had been included in the Closing.

(Emphases in original.)

EQT contends that this clause creates an ambiguity as to the assets being conveyed. But this clause actually proceeds in much the same manner as the other clauses identified above. Just as the previously quoted provisions of the PSA state that EQT will "deliver to [Journey] an assignment of the Properties," the Further Assurances clause states that EQT will carry out whatever "other and further acts" prove necessary to "assign the Properties to [Journey]." The "Properties" include the Leasehold Interest, and the Leasehold Interest, as noted above, includes the assets listed on Exhibit A. Hence, the Further Assurances clause is entirely consistent with the earlier-described contractual language because both sections of the contract make plain that the interests on Exhibit A were to be transferred to Journey as part of the broader transfer of the Properties.

Nor does the reference to Exhibit N defeat this analysis. The PSA's Further Assurances clause mentions Exhibit N only after stating that EQT will in fact "grant, convey and assign the Properties" to Journey, and it adds that any reference to Exhibit N operates "[w]ithout limiting the foregoing." Exhibit A thus plainly trumps Exhibit N, with the result that the PSA is not

"reasonably susceptible," *see Blevins v. Riedling*, 158 S.W.2d 646, 648 (Ky. 1942), to EQT's argument that Exhibit N limits the extent of the transaction.

EQT's contrary position is based on its contention that not limiting the transaction to the maps on Exhibit N would defeat the purpose of the Further Assurances clause. Such clauses, EQT argues, are meant to ensure that the buyer receives the full benefit of its bargain by requiring the seller to complete any miscellaneous tasks required for the transfer of the property at issue. The Further Assurances clause in this case, EQT asserts, should thus be construed as defining the entire scope of the parties' transaction; otherwise, "Journey inexplicably only sought guarantees that it obtained all the relevant property interests within *some portions* of the acreage it acquired, rather than for *all* of the acreage covered in the contract." (Emphases in original.)

EQT's argument, however, is based on the incorrect assumption that the Further Assurances clause in the PSA applies only to the lands shown within the blue lines on Exhibit N. The clause does reference Exhibit N, but the clause also refers to the parties' broader transaction: It states that "Seller and Buyer shall . . . do such other and further acts and things[] as may be reasonably necessary to more fully and effectively grant, convey and assign *the Properties* to [Journey]." (Emphasis added.) Because the Properties, as noted above, include the lands listed on Exhibit A to the PSA without regard to whether those lands also appear on Exhibit N, the Further Assurances clause is not limited exclusively to the maps on Exhibit N. As a result, the clause does not limit the transaction solely to the lands within the maps on that exhibit.

EQT's argument also places undue weight on the purported importance of further-assurances clauses in general. These clauses "are aimed at [the] purely ministerial actions" necessary to complete a transaction. Michael B. Dorff, *Selling the Same Asset Twice: Towards a New Exception to Corporate Successor Liability Rules*, 73 Temp. L. Rev. 717, 729 (2000). They are accordingly "unlikely to be stretched by a court into a substantial substantive requirement." *Id.*; *see also, e.g.*, *Boyd Grp. (U.S.) Inc. v. D'Orazio*, No. 14 CV 7751, 2015 WL 3463625, at *5 (N.D. Ill. May 29, 2015) (citing cases "in which courts refused to impose new or different obligations on parties pursuant to further assurance clauses"). The record before us contains no indication that the parties in this case intended for the Further Assurances clause to operate as a

substantive limit on the scope of the 2001 Agreement, and we consequently reject EQT's invitation to read the clause's reference to Exhibit N as creating such a limit.

Journey, moreover, explained in its brief and at oral argument why the Further Assurances clause specifically references Exhibit N. In particular, the lands shown on the Exhibit N maps were the most productive and valuable oil fields encompassed by the 2001 Agreement. The property interests lying outside the blue lines, but nonetheless appearing on Exhibit A, might or might not prove to be productive fields, but the interests on Exhibit N were already known to be highly valuable. So even though the Further Assurances clause, as noted above, applies to all of the Properties that EQT conveyed, Journey apparently focused on Exhibit N in particular simply as an extra safeguard to ensure that it would in fact receive the most valuable properties involved in the transaction.

EQT objects that considering Journey's explanation for the wording of the Further Assurances clause is improper if the 2001 Agreement is indeed unambiguous. For the reasons explained above, however, we find that the Further Assurances clause in and of itself does not support EQT's argument. We recount Journey's explanation for the clause simply to clarify what might otherwise be a puzzling provision of the 2001 Agreement, but we do not rely on Journey's explanation in reaching our ultimate decision.

EQT next turns to the 2001 Lease as support for its contention that the Agreement is ambiguous. It relies on the following language:

> The lands covered hereby are situated in Leslie, Letcher and Perry Counties, in the Commonwealth of Kentucky and are more particularly described on Exhibit "A" and shown on Exhibit "A-1" (Map) each of which are attached hereto and made a part hereof (the "Leased Premises"). Exhibit A specifies the number of acres contained in each separate and distinct tract ("Tract") comprising the Leased Premises and for the purpose of this Lease, such acreage designations shall be deemed to be correct, whether actually more or less.

Because the above-quoted provision refers to both Exhibit A and Exhibit A-1, and because those exhibits are admittedly not coextensive, EQT contends that the above provision is necessarily ambiguous. We find this contention unpersuasive. The 2001 Lease specifically states that (1) "Exhibit A" (not Exhibit A-1) describes the lands that "compris[e] the Leased

Premises," (2) "Exhibit A" (not Exhibit A-1) "specifies the acres contained" in the lands to be transferred, and (3) the acreages on Exhibit A (not the maps on Exhibit A-1) "shall be deemed to be correct." The plain text of the Lease thus establishes that the list of the lands—as opposed to any map—sets out of the scope of the transaction.

In addition, the 2001 Lease and the PSA are—as EQT observes—"interrelated," meaning that we should construe the documents together. *See, e.g.*, *ABCO-BRAMER, Inc. v. Markel Ins. Co.*, 55 S.W.3d 841, 845 (Ky. Ct. App. 2000) ("Under Kentucky law, . . . all writings that are part of the same agreement are construed together."). Here, the 2001 Lease provides that the property interests to be conveyed are "more specifically described in [the PSA.]" And the PSA, as discussed above, unambiguously establishes that the maps of the lands within the blue lines do not limit the extent of the parties' transaction. The reference to the PSA in the 2001 Lease is thus a further indication that the Lease—like the PSA itself—is not limited to the property interests within the blue lines.

Further support for this conclusion comes from the Master Assignment. Clause (a) in that document describes the lands to be conveyed to Journey as EQT's "right, title and interest in and to the oil, gas and/or mineral leases, royalty interests and overriding royalty interests described on **Exhibit A** attached hereto and made a part hereof." (Emphasis in original.) The Master Assignment does not mention any map in connection with this clause, and Exhibit A to the Master Assignment similarly contains no reference to any maps. Thus, much like the PSA and the 2001 Lease, the Master Assignment uses the list of properties attached to the document—rather than any map—to describe the lands conveyed to Journey.

In sum, we are persuaded that EQT unambiguously conveyed to Journey all the property interests listed on Exhibits A to the PSA, the 2001 Lease, and the Master Assignment. EQT advances several arguments to resist this result but, as explained below, we find none of these arguments persuasive.

### 3.	*The district court did not erroneously apply the contra-proferentem canon of construction*

EQT first contends that the district court erred in applying the contra-proferentem canon of construction.  This canon provides that, if a contractual term is ambiguous, then the term should be construed against the party that drafted it.  *Weinberg v. Gharai*, 338 S.W.3d 307, 313 (Ky. Ct. App. 2011).  But the canon does not apply if the contract is unambiguous.  *Florman v. MEBCO Ltd. P'ship*, 207 S.W.3d 593, 600 (Ky. Ct. App. 2006).  In the present case, EQT observes that the district court concluded that the 2001 Agreement is not ambiguous, but that the court nonetheless mentioned the contra-proferentem canon at several points throughout its opinions and orders.  EQT thus maintains that the court "reversed" the proper analysis by using the contra-proferentem canon "to aid its conclusion that there was *no* ambiguity."  (Emphasis in original.)

This contention lacks merit.  The district court first mentioned the contra-proferentem canon simply as an alternative basis for its interpretation of the 2001 Agreement.  In particular, it concluded that the Agreement was not ambiguous, and only then continued its analysis, writing that, "*even if* any ambiguity did exist, ambiguities in a contract are generally construed against the drafter."  (Emphasis added.)  Hence, the court properly determined as an initial matter that the contract was not ambiguous and then mentioned the contra-proferentem canon simply as an alternative (but unnecessary) rationale for its ruling in Journey's favor.  The reference to the canon thus did not affect the court's judgment and does not supply a ground for reversing its decision.

Next, the district court mentioned the contra-proferentem canon in ruling on several of the parties' post-trial motions.  The court noted at that time that it had previously "ruled that the contract between Journey and EQT was not ambiguous, and that under basic rules of contract law, a contract is construed against the drafter."  This was a passing reference to the court's earlier ruling, which, as noted above, addressed the contra-proferentem canon only as an alternative basis for the court's decision.  Such reference does not supply a valid ground for appeal.

EQT then cites two implied references to the contra-proferentem canon in the district court's ruling on Journey's motion for entry of a final judgment. In that ruling, the court reviewed EQT's assertion of the laches defense and observed that "EQT did not present evidence demonstrating that Journey's delay in asserting its rights was unreasonable, . . . particularly in light of the fact that EQT was the party who drafted the conveyance documents including the Exhibit N maps." The court also assessed whether an award of prejudgment interest was appropriate. It noted that EQT, "as the drafter of the contract and the seller of the property," was "in the better position to know what it sold, and thus EQT's delay in ascertaining what property it conveyed is perhaps equally culpable and at least cancels out any repercussions from Journey's delay."

These statements do not establish that the district court was applying the contra-proferentem canon; instead, the court appears to have been balancing the equities to determine whether the defense of laches and the remedy of prejudgment interest were relevant to the case at hand. The references to EQT drafting the 2001 Agreement thus impacted the defenses and remedies involved in this case, but they did not play any role in the district court's interpretation of the underlying contract. We therefore find no reversible error in the court's analysis.

### 4.          *EQT's course-of-performance evidence is irrelevant*

EQT next argues that the district court should have used the parties' course of performance to conclude that both parties believed that the 2001 Agreement covered only the lands depicted within the blue lines on Exhibits N and A-1. This argument relies on *A.L. Pickens Co. v. Youngstown Sheet & Tube Co.*, 650 F.2d 118, 120 (6th Cir. 1981), in which the court stated as follows: "When a contract provision is, as the instant provision, *reasonably subject to more than one interpretation*, the Kentucky courts utilize the doctrine of contemporaneous construction." *Id.* (emphasis added). Under this doctrine, "courts are required to give great weight to the interpretation which the parties have placed *on an ambiguous contract*. The construction of the parties is best evidenced by their conduct with respect to the agreement." *Id.* (emphasis added) (quoting *Billips v. Hughes*, 259 S.W.2d 6, 7 (Ky. 1953)).

The emphasized language establishes that course-of-performance evidence is relevant only when the contract at issue is ambiguous. *See id.* at 120. As determined above, however, the 2001 Agreement is not ambiguous. The parties' course of performance accordingly has no bearing on the Agreement's meaning. *See id*; *see also Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002) (observing that a court may consider "the conduct of the parties" only when "a contract is ambiguous or silent on a vital matter").

**5.      *Journey's contract with KRCC does not affect the interpretation of the term "Properties" in the 2001 Agreement***

Finally, EQT argues that the district court's interpretation of the 2001 Agreement inappropriately gives the term "Properties" different meanings in different provisions of the PSA. This consequence purportedly flows from Journey's transaction with a separate entity known as KRCC Oil and Gas Company.

Prior to the execution of the 2001 Agreement, EQT conducted many of its Kentucky operations as a joint venture with KRCC. At the time of the Agreement, Journey accordingly sought to acquire both EQT's rights in the operations at issue and any rights that KRCC, as a joint venturer, had in those operations. Journey thus entered into two transactions, one with EQT and the other with KRCC, and the PSA reflects this fact because the PSA became effective only after KRCC waived its rights and consented to the operation of the Properties by Journey. EQT then notes that KRCC's interests in the Properties were undisputedly located solely within the blue lines depicted on the maps included with the 2001 Agreement. This means, according to EQT, that the term "Properties" in the PSA must also be limited to the assets located within the lines on those exhibits.

EQT's argument lacks merit. The PSA simply states that KRCC was required to waive whatever interests in the Properties it might have possessed; the PSA does *not* state that KRCC's interests were coextensive with all the operations owned by EQT or that KRCC's interests otherwise defined or limited the scope of such operations. Put differently, the fact that KRCC's interests all happened to fall within the blue lines on the maps included with the 2001 Agreement in no way forecloses an interpretation of "Properties" that includes additional lands located

outside of those lines. Reading the term "Properties" to include more than the lands within the lines thus does not create any inconsistency with respect to Journey's transaction with KRCC.

**B.** **The district court did not commit reversible error in precluding EQT from presenting evidence of the parties' intent in 2001**

EQT next asserts that the district court erred by using Rule 403 of the Federal Rules of Evidence to preclude EQT from introducing evidence of its intent at the time that it entered into the 2001 Agreement. We review the exclusion of evidence pursuant to Rule 403 under the abuse-of-discretion standard. *United States v. Poulsen*, 655 F.3d 492, 509 (6th Cir. 2011). The evidence in question is viewed in the light most favorable to its proponent, but the district court ultimately has "broad discretion" in ruling on admissibility. *Id.* Reversal is accordingly appropriate only if we have "a definite and firm conviction that the trial court committed a clear error of judgment." *Mich. First Credit Union v. Cumis Ins. Soc'y, Inc.*, 641 F.3d 240, 245 (6th Cir. 2011) (internal quotation marks omitted).

### 1. *Kentucky trespass law*

EQT trespassed on Journey's lands by drilling and operating wells that removed oil and natural gas from that land. The appropriate measure of damages in such "mineral trespass" cases turns on whether the trespass was "innocent" or "willful." *Harrod Concrete & Stone Co. v. Crutcher*, 458 S.W.3d 290, 294 (Ky. 2015). If the trespass was innocent, then the measure of damages is "the value of the mineral after extraction, less the reasonable expenses incurred by the trespasser in extracting the mineral." *Id.* at 296. But when the trespass is willful, then "the measure of damages is the reasonable market value of the mineral at the mouth of the mine/well, without an allowance of the expense of removal." *Id.*

An innocent trespass is one that is "inadvertent or the result of an honest mistake." *Id.* at 297 (internal quotation marks omitted). Willful conduct, in contrast, involves a trespasser "who knowingly and willfully encroaches or enters upon the land of another and takes his mineral without color or claim of right, or one who dishonestly or in bad faith mines minerals of another and converts them to his own use." *Id.* (citation omitted). The "Innocent/Willful Dichotomy," *id.* at 297, thus turns on the trespasser's reasonable belief at the time of the trespass. *See Swiss*

*Oil Corp. v. Hupp*, 69 S.W.2d 1037, 1042 (Ky. 1934), *abrogated in part on other grounds by Harrod*, 458 S.W.3d 290 ("The test is . . . [the trespasser's] sincerity and his actual intention at the time."); *see also Rudy v. Ellis*, 236 S.W.2d 466, 468 (Ky. 1951) ("The test to determine whether one was a wilful or an innocent trespasser is . . . his honest belief and his actual intention at the time he committed the trespass . . . ." (citation omitted)).

Once the jury determined that EQT had trespassed, the burden shifted to EQT to establish that its trespasses were not willful. *See Swiss Oil*, 69 S.W.2d at 1041. Whether EQT has carried its burden involves factors such as "whether [the trespass] was done under a bona fide mistake" and whether there was "reasonable doubt of the other party's exclusive or dominant right." *Id.* In addition, a trespass is more likely to be willful when the trespasser lacked "policies and procedures" to assess the boundaries of its property or when it "continued or perpetuated its encroachment despite cautionary indicators that property may have been misidentified." *Harrod*, 458 S.W.3d at 298 (citation omitted).

### 2. EQT's arguments

EQT sought to establish that its trespasses were innocent by introducing evidence of its intent at the time that the parties negotiated the 2001 Agreement. In particular, it planned to elicit testimony from its vice presidents Joseph Morris and Lester Zitkus, who would have explained that the maps on Exhibits N were the basis for the company's determination about what properties to sell. This evidence, according to EQT, would have shown that EQT reasonably believed that the lands located outside of the blue lines on the maps had not been conveyed to Journey, making EQT's subsequent drilling on those lands innocent trespasses. EQT thus maintains that the exclusion of such evidence under Rule 403 led the jury to erroneously conclude that EQT's trespasses were willful.

### 3. Analysis

To succeed on its Rule 403 argument, EQT must show both that (1) the district court erred in excluding EQT's evidence, and (2) this exclusion prejudiced EQT. *See Nolan v. Memphis City Sch.*, 589 F.3d 257, 264-65 (6th Cir. 2009) ("Even if a district court's evidentiary

ruling is erroneous, a new trial is not warranted if the abuse of discretion constituted harmless error.").  As explained below, EQT cannot prevail on either prong of this analysis.

> ### a.   The district court did not abuse its discretion in concluding that the probative value of EQT's evidence was substantially outweighed by other factors

Rule 403 allows a district court to exclude evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  With respect to probative value, EQT maintains that the testimony from Morris and Zitkus about their intent in 2001 was "[c]rucial" evidence that went to the "crux" of the willfulness issue.  But this characterization exaggerates the importance of the proffered testimony.  The more relevant inquiry is whether EQT had a reasonable belief in the legality of its actions "at the time [that it] committed the trespass." *See Rudy*, 236 S.W.2d at 468 (citation omitted); *see also Meece v. Feldman Lumber Co.*, 290 S.W.3d 631, 632-33 (Ky. 2009), *as corrected* (June 22, 2009) (same).  Of critical importance here is the fact that the majority of EQT's trespasses occurred not during 2001—the period about which Morris and Zitkus would have testified—but instead between 2006 and 2011, when the great majority of the Trespass Wells were drilled.

EQT concedes as much, but it nonetheless asserts that the evidence from 2001 would have at least given the jury an understanding of why EQT allegedly believed that it still owned the disputed properties even up to ten years later.  We find this argument unpersuasive because, as described in Part II.B.3.b. below, events post-dating the parties' negotiations should have alerted EQT to the likelihood that its belief about the extent of the 2001 Agreement was mistaken.  These events should have caused EQT to question its initial understanding of the 2001 Agreement, with the result that EQT's proffered testimony about that initial understanding has little probative value. *See* Fed. R. Evid. 403.

With respect to "unfair prejudice," "confusing the issues," and other factors, *see id.*, this court has noted that the exclusion of evidence may be appropriate when the evidence suggests to

the jury that it should decide the case "on an improper basis," *United States v. Poulsen*, 655 F.3d 492, 509 (6th Cir. 2011) (internal quotation marks omitted). EQT asserts that its proffered evidence presented no danger of such an "improper basis," but we disagree. By seeking to introduce evidence of what EQT perceived the Agreement to mean in 2001, EQT sought to introduce evidence that the jury could have easily used to reinterpret the Agreement for itself. And because the district court had already correctly concluded that the Agreement is unambiguous (*see* Part II.A. above), such a use of EQT's evidence by the jury would in fact have been improper. *See Jacob v. Dripchak*, 331 S.W.3d 278, 284 (Ky. Ct. App. 2011) ("[T]he interpretation of a contract is solely a matter of law for the courts."). EQT's proffered evidence, in other words, invited the jury to usurp the district court's role as the interpreter of the 2001 Agreement, so admitting that evidence would in fact have given the jury an "improper basis" for its decision. *See Poulsen*, 655 F.3d at 509.

For these reasons, EQT's evidence both (1) had little probative value, and (2) carried a substantial risk that the jury would tread into the forbidden realm of contract interpretation. There was accordingly no "clear error in judgment" by the district court in deciding to exclude the evidence. *See United States v. Bell*, 516 F.3d 432, 440 (6th Cir. 2008) (citation omitted).

### b. The district court's exclusion of the evidence did not prejudice EQT to such a degree that reversal is warranted

Moreover, even if the district court's evidentiary ruling had been erroneous, reversal would be appropriate only on a showing that the ruling resulted in prejudice to EQT. *See Nolan*, 589 F.3d at 264-65. This standard requires EQT to establish that the error "more probabl[y] than not" had a "material[]" effect on the jury's verdict. *See United States v. Schaeffer*, 626 F. App'x 604, 609 (6th Cir. 2015) (quoting *United States v. Trujillo*, 376 F.3d 593, 611 (6th Cir. 2004)). For two reasons, EQT cannot make such a showing.

First, even without EQT's proffered testimony, the jury heard evidence of EQT's understanding of the 2001 Agreement at the time of its execution. Morris, for example, testified about the maps on which EQT relied, explaining that "we had a set of maps that had the tract outlines, and we outlined—Lester Zitkus and I, who was our land manager—outlined what tracts we wished to be part of the sale. And that was back prior to the sale to Journey." He added that

"[t]he lines were placed on maps originally when EQT was talking about the sale and what areas they would sell. And so we had . . . drafted out, had drawn the tract outlines around the oil fields that we wished to sell." Other witnesses testified similarly, and although Journey's counsel complained about some of these comments, the district court did not strike them. So despite the exclusion of certain testimony about EQT's understanding in 2001, the jury still heard evidence of that understanding.

Second, the jury heard evidence from which it could easily have concluded that, by the time EQT committed its trespasses, any belief that EQT had formed in 2001 about the extent of its drilling rights was unreasonable. The district court, for example, noted that Journey had presented evidence indicating that EQT did not conduct thorough title searches before drilling the Trespass Wells. In addition, the jury heard extensive testimony about EQT's drilling on property known as the Fordson Lease. One of EQT's own land managers, for example, testified that the documents comprising the 2001 Agreement created a "question mark" about which portions of the Fordson Lease had actually been transferred to Journey. EQT contacted Journey about this ambiguity, but, as the district court noted, the ensuing communications failed to resolve the issue and, "[i]f anything, . . . should have made EQT even more cautious about drilling on the property at issue before taking affirmative steps to clear up that confusion."

So EQT carried out its drilling despite obvious indicators that its ownership of the underlying property was doubtful, thereby giving the jury an ample basis to conclude that EQT's trespasses were not in good faith. *See Harrod Concrete & Stone Co. v. Crutcher*, 458 S.W.3d 290, 298 (Ky. 2015) (observing that a trespass is more likely to be willful when the trespasser "continued or perpetuated its encroachment despite cautionary indicators that property may have been misidentified"). In addition, these indications post-dated the parties' 2001 negotiations. EQT's proffered testimony about its earlier intent therefore would not likely have changed the jury's assessment of EQT's conduct at the time that the trespasses actually occurred, with the result that a reversal of the district court's evidentiary decision is not warranted.

**C.** **The district court did not err in awarding prejudgment interest and transferring the Trespass Wells to Journey**

EQT finally challenges (1) the district court's award of $4,988,133 in prejudgment interest, and (2) the transfer of EQT's interests in the Trespass Wells to Journey.

### 1. *Awarding prejudgment interest was not an abuse of discretion*

The award of prejudgment interest in a case such as this one is "left to the sound discretion of the trial court." *See Denzik v. Denzik*, No. 2004-CA-000944-MR, 2006 WL 3107110, at *2 (Ky. Ct. App. Nov. 3, 2006). In exercising its discretion, a court must base its decision "upon the foundation of equity and justice." *Church & Mullins Corp. v. Bethlehem Minerals Co.*, 887 S.W.2d 321, 325 (Ky. 1992). A court must therefore consider "all the circumstances" of a given case, "including any deficiencies in the performance of the injured party and any unreasonableness in the demands made by him." *Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136, 144 (Ky. 1991) (citation and internal quotation marks omitted). Other factors to consider include "the length of time for which the trespass continued," *Church*, 887 S.W.2d at 325, and whether the "the injured [party] has discouraged settlement . . . or has delayed in filing suit," *Nucor*, 812 S.W.2d at 144 (citation and internal quotation marks omitted).

The district court in this case acknowledged that Journey had potentially "delayed in filing suit," *see id.*, but concluded that other circumstances outweighed this factor. It noted, for example, that EQT was the drafter of the 2001 Agreement and had retained the information relating to the wells in question, such that EQT was the party that was in the best position to ascertain which interests had actually been conveyed to Journey. The court also noted the lengthy time period during which EQT's operation of the Trespass Wells persisted and recounted the evidence at trial that supported the jury's finding that EQT's trespasses were not in good faith. In light of these considerations, the court's award of prejudgment interest was not unreasonable. *See Mich. First Credit Union v. Cumis Ins. Soc'y, Inc.*, 641 F.3d 240, 245 (6th Cir. 2011) ("[T]here is no abuse of discretion unless the court has 'a definite and firm conviction that the trial court committed a clear error of judgment.'").

EQT nevertheless argues that the award was improper because Kentucky courts "rarely" impose such awards. *See Ky. Commercial Mobile Radio Serv. Emergency Telecomms. Bd. v. TracFone Wireless, Inc.*, 712 F.3d 905, 917 (6th Cir. 2013) ("Kentucky courts rarely award prejudgment interest on unliquidated claims on equitable grounds."). We find this argument unconvincing. First, the general trend in Kentucky caselaw says little about whether an award of interest is appropriate for any particular claim, especially given the inherently fact-bound analysis involved in considering "all the circumstances," *see Nucor*, 812 S.W.2d at 144, of a specific case. Second, although this court noted in *TracFone* that prejudgment interest is rarely awarded, it also noted "that allegations of bad faith are often involved" in those cases in which prejudgment interest *is* awarded. 712 F.3d at 917 (citation and internal quotation marks omitted). The current case involved not only "allegations of bad faith," but a jury finding and final judgment that EQT had in fact acted in bad faith through its willful trespasses. Hence, even though awards of prejudgment interest are rare in Kentucky, the finding of bad faith in this particular case makes such an award appropriate.

### 2. The district court did not err in transferring the Trespass Wells to Journey

EQT next argues that the district court erred by requiring EQT to transfer to Journey its interests in the Trespass Wells. This argument rests in part on a distinction between "shallow" drilling rights and "deep" drilling rights. In particular, EQT notes that the 2001 Agreement undisputedly contemplates that Journey would acquire the right to drill only in the "shallow" portions of the lands in which Journey acquired an interest. EQT, in contrast, retained the right to drill in the "deep" portions of those lands. In addition, EQT retained the right to go onto the surface of the lands in order to construct and operate wells, so long as those wells were in fact to be used for deep rather than shallow drilling.

Based on this distinction, EQT maintains that it should be allowed to retain the Trespass Wells. Those wells were admittedly designed for shallow drilling—and thus their operation did in fact constitute trespasses on Journey's Properties—but EQT now contends that the wells could be converted for deep drilling that would not trespass on Journey's Properties.

Whether the Trespass Wells could be so converted is questionable. The wells were designed for shallow drilling, and EQT raised the prospect of converting the wells only in its reply brief in support of its motion for a new trial. EQT cited no evidence in the record suggesting that such a conversion is technologically feasible, and Journey's counsel explained at a post-trial status conference that such a conversion is "not an engineering possibility" and that "[i]t would be substantially cheaper to drill a new vertical well [than] to . . . deepen existing locations." In addition, the district court noted that EQT did not contest Journey's assessment of the infeasibility of the wells' conversion. This undermines EQT's claim that it should retain the wells for such a purpose.

The transfer of the wells, moreover, is consistent with the recent decision in *Harrod Concrete & Stone Co. v. Crutcher*, 458 S.W.3d 290 (Ky. 2015). The Kentucky Supreme Court explained in that case that "the measure of damages" for a willful mineral-trespass claim "is the reasonable market value of the mineral at the mouth of the mine/well, without an allowance of the expense of removal." *Id.* at 296. EQT in the present case is accordingly liable for the value of any oil or natural gas that it extracted from the Trespass Wells, and it is not entitled to any offset for the expenses incurred in drilling and operating such wells. *See id.*

By requesting that it retain the Trespass Wells, however, EQT is essentially requesting just such an offset. EQT, in other words, incurred the cost of drilling and operating the Trespass Wells. It now seeks to recoup those expenses by retaining the Trespass Wells themselves. EQT concedes as much, complaining that—by virtue of the district court's order—EQT "was not permitted to offset the millions of dollars it spent to drill and operate the wells." But such an offset is inconsistent with Kentucky law, *see Harrod*, 458 S.W.3d at 296, so the district court did not err in declining to grant such an offset to EQT.

In addition, EQT exaggerates the effect of the district court's decision. It asserts that the court "deprived EQT of its deep-drilling rights" by precluding EQT from using the Trespass Wells to drill in the deep portions of the properties in which EQT retained an interest. But the court did no such thing. As both the district court and Journey observed, EQT may enter onto the surface of the Properties in which Journey has an interest so long as EQT does so for the purpose of drilling new wells that are designed to reach the deep portions of those Properties.

That EQT cannot use the existing Trespass Wells that were designed and built to drill in the *shallow* portions of the Properties thus has no effect on EQT's *deep*-drilling rights under the 2001 Agreement.

EQT also contends that the district court's transfer of the wells was a punitive remedy that violates Kentucky law. *See Harrod*, 458 S.W.3d at 297 (noting that damages in mineral-trespass actions do not include "an additional or separate recovery for punitive damages"). It notes that the court awarded damages to Journey that undisputedly encompass the full value of the oil and gas extracted from the wells. As a result, EQT concludes that any additional remedy—such as the transfer of the wells—must have been a punitive measure designed to do more than simply account for Journey's harm.

But EQT's argument misconstrues the nature of the district court's remedy. The court explicitly stated that it did "not view transferring the Trespass Wells as a part of the monetary damages" awarded to Journey. Instead, the court transferred the wells as an equitable remedy designed to ensure that they would not simply lay idle. EQT's observation that Kentucky law does not countenance punitive damages awards in mineral-trespass actions is accordingly inapplicable to the present case.

In addition, although neither party has cited a Kentucky case directly on point, the district court's ultimate conclusion—that EQT as a willful trespasser had no claim to the Transfer Wells—appears to be consistent with equitable principles governing such cases in general. *See Etalook v. Exxon Pipeline Co.*, 831 F.2d 1440, 1444 (9th Cir. 1987) ("[T]he common law rule [is] that a trespasser who builds on another's land dedicates his structure to the land's owner."); *Halley v. Winchester Diamond Lodge*, 30 S.W. 999, 999 (Ky. 1895) ("It would seem inconsistent with all rules to allow a trespasser to make the person trespassed against his debtor, for improvements made without his consent and against his will, or to allow him to set them off against the damages to which he has justly subjected himself by his trespass." (citation and internal quotation marks omitted)). These equitable principles support the conclusion that the district court's selection of the appropriate remedy in this case was not the sort of "clear error of judgment" that would justify reversal. *See Mich. First Credit Union v. Cumis Ins. Soc'y, Inc.*, 641 F.3d 240, 245 (6th Cir. 2011).

Finally, the parties dispute the effect of Kentucky's policies towards natural resources. Under Ky. Rev. Stat. Ann. § 353.500(1), the state's official policy is "to encourage exploration for [mineral] resources," to "prohibit waste and unnecessary surface loss and damage," and to "encourage the maximum recovery of oil and gas from all deposits thereof." The district court cited this policy as support for its decision to transfer the Trespass Wells, but EQT challenges this use of § 353.500(1). It notes that Kentucky law also provides that "[n]othing in KRS 353.500 . . . shall be construed as superseding, impairing, abridging or affecting any contractual rights," Ky. Rev. Stat. Ann. § 353.720, leading EQT to contend that the court erred by using § 353.500 to "supersede" its deep-drilling rights.

As explained above, however, the transfer of the Trespass Wells does not alter EQT's contractual rights. EQT remains free to enter onto the surface of the Properties in which it has deep-drilling rights and to construct new wells to exploit those rights. This remains true regardless of whether EQT or Journey controls the Trespass Wells. The district court's interpretation of the statutes at issue was therefore not erroneous.

## VI. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.